Argued and submitted March 5, judgment of the Tax Court affirmed May 21, 1998

# Paul MILLER
## and Robin Miller,
*Appellants,*

*v.*

# DEPARTMENT OF REVENUE,
## State of Oregon,
*Respondent.*

## (OTC 3763)

# Kathleen JOHNSTON
## and Frank Johnston,
*Appellants,*

*v.*

# DEPARTMENT OF REVENUE,
## State of Oregon,
*Respondent.*

## (OTC 3764)

# Robert H. LOVERIN
## and Jane Loverin,
*Appellants,*

*v.*

# DEPARTMENT OF REVENUE,
## State of Oregon,
*Respondent.*

## (OTC 3768; SC S43674)

958 P2d 833

Steven W. Seymour, of Samuels, Yoelin, Kantor, Seymour & Spinrad, LLP, Portland, argued the cause and filed the briefs for appellants.

Marilyn J. Harbur, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were James C. Wallace, Assistant Attorney General, and Hardy Myers, Attorney General.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Durham, and Leeson, Justices.**

LEESON, J.

** Graber, J., resigned March 31, 1998, and did not participate in the decision of this case. Kulongoski, J., did not participate in the consideration or decision of this case.

## LEESON, J.

Taxpayers, who are the general partners and the spouses of the general partners in three Oregon limited partnerships, appeal from a judgment of the Oregon Tax Court that assessed additional Oregon income taxes against them for the years 1985, 1986, 1987 and 1988. We review for errors of law, ORS 305.445,[1] and affirm.

### FACTUAL BACKGROUND

The Tax Court made the following findings of fact, none of which the parties challenge:

"In 1984, Robert Loverin and Paul Miller, who are brothers-in-law, were employed by Rockwood Development Corporation (Rockwood), an Oregon Corporation. Rockwood was owned by Miller's parents and other family members. Rockwood engaged in creating, purchasing, and managing low-income housing projects, most of which were owned by limited partnerships. * * *

"In 1984, Loverin and Miller decided to start their own business because Rockwood was having financial difficulties. They formed BP Corporation to engage in the same kind of business as Rockwood. Knowing they did not have the level of management experience in low-income housing required by the U.S. Department of Housing and Urban Development (HUD), they obtained the extensive experience of Rockwood through a series of management agreements.

"It was through Rockwood that Loverin and Miller became aware of Edward and Fern Fischer, owners of four low-income housing projects commonly know as Fischer Court I, Fischer Court II, East Ninth Street (Maple Court), and Southfair. In May 1984, Rockwood offered to purchase the four Fischer projects, but the Fischers rejected the offer.

---

[1] ORS 305.445 was amended effective September 1, 1997. It now provides, in part:

"The scope of the review of either a decision or order of the tax court judge shall be limited to errors or questions of law or lack of substantial evidence in the record to support the tax court's decision or order."

Before the effective date of the amendment, this court's standard of review was *de novo*. Because the case presents only issues of law, our review is the same under either the previous or amended version of the statute.

In September 1984, BP Corporation made an offer which the Fischers accepted. The offering price was $3,500,000, with $650,000 down and the balance of $2,850,000 in the form of a 15-year nonrecourse wrap-around note bearing nine percent simple interest. The offer acknowledged that the properties were subject to HUD insured mortgages and required the Fischers to pay the mortgage payments out of the note payments they received from the buyers. * * *

"The principals of BP Corporation, Loverin and Miller, * * * formed a limited partnership for each property and thereafter sought investors for the partnerships. Money invested by the limited partners would be used to make the down payments on the apartment projects.

"Only Fischer Court I, Fischer Court II, and East Ninth Street Apartment Projects are involved in this litigation, Southfair being the subject of a separate case. The three projects involved the same process and types of documents. Therefore, for purposes of analysis, the parties and the court have focused upon one project, Fischer Court I.

"* * * * *

"On September 20, 1984, the partnership and the Fischers executed an agreement of sale providing for the purchase of Fischer Court I by the partnership for $1,224,000. In December 1984, this price was amended to $1,185,600 with $188,914 due at closing. The difference between the two amounts is a 'finder's fee' of $38,400 * * *.

"The down payment of $188,914, due at closing, was in the form of a nonrecourse note due January 1, 2000. The note, dated December 11, 1984, provided that an 'installment' of $188,914 was due on June 30, 1985, or upon completion of syndication, whichever occurred first. The note bore interest at nine percent compounded semi-annually. The balance of the purchase price was in the form of a [nonrecourse] 'residual note' in the amount of $996,686. This note wrapped around the unpaid balance of the HUD mortgage on the properties. The balance of the HUD mortgage at the time of the agreement was $363,683. [Neither the partnership nor its partners was liable on the downpayment or the wraparound note.]

"* * * * *

"Loverin and Miller then solicited limited partners through private placement memorandums. Taxpayers were

unable to find a copy of the private placement memorandum for Fischer Court I. They did find a copy of the private placement memorandum for Fischer Court II and offered it into evidence as being similar to the one for Fischer Court I. That document projected benefits for limited partners from November 1985 through December 1995. It projected no cash flow but only income tax deductions. The projection assumed investors in the 50 percent tax bracket and showed tax savings exceeding the limited partners' required annual investment (including interest) for every year except 1990. In 1990, the limited partner would be expected to contribute $4,760 in capital plus $583 in interest (total $5,343) while the projected tax savings were $5,104. Loverin and Miller experienced some delays but eventually obtained the limited partners necessary for Fischer Court I.

"Upon audit, the auditor concluded that the property's sales price significantly exceeded the property's fair market value. The assessed value for property tax purposes in 1985 was land $98,370 and improvement $529,520, for a total of $627,890. The final agreed sales price was $1,185,600. Under the terms of the sale, the only payments to be made under the residual note were the amounts due on the HUD mortgage. The rest of the principal and interest were deferred. When the note becomes due on January 1, 2000, the [taxpayers] will owe $2,718,010.

"The auditor concluded that because the debt was all nonrecourse debt and the amount of the money owing on the property exceeded its fair market value, the partners had no economic interest in the property. Moreover, the payments on the 'down payment note' were delayed until August 1986. Until then, the partners had only been paying the underlying HUD mortgage and were not acquiring any equity in the property. Consequently, the auditor did not believe taxpayers were entitled to depreciation based on their cost basis. The auditor did recognize basis to the extent of fair market value, and separately considered personal property.

"The auditor also increased the estimated life of the property for depreciation purposes from 15 years to 30 years. The auditor explained that the basic Internal Revenue Service life guideline for buildings is 45 years. Therefore, because the subject property was 15 years old at the

time of purchase, the auditor reasoned that there should be 30 years left.

> "Finally, on their income tax returns, the general partners allocated 99.9 percent of the losses to themselves up to the time the investing limited partners were admitted. The auditor reallocated these losses according to the provisions in the limited partnership agreement, allocating two percent to general partners and 98 percent to limited partners."

*Miller v. Dept. of Rev.*, 13 OTR 488, 490-93 (1996) (internal footnote omitted).

Taxpayers appealed the notices of assessment that were issued pursuant to the audit. After the administrative hearing, the Department of Revenue (Department) concluded that the sales were not arm's-length transactions and that the best indication of the fair market value of the properties was their assessed value on January 1, 1985. For Fischer Court I, which is the property selected for the purpose of analysis before the Tax Court and this court, the assessed value was $627,890. The Department sustained the auditor's adjustments to depreciation and her adjustments regarding allocation of profits and losses to the general and limited partners. Taxpayers appealed to the Tax Court.

According to the Tax Court, it was "unlikely that the total amount due under the wrap note will ever be paid" and that there was "no economic basis for the numbers involved except tax benefits." The court concluded that the purchase price of Fischer Court I exceeded its fair market value, that taxpayers had failed to establish that the remaining useful life of the property was 15 years and that the limited partnership agreement did not provide for allocation of 99.9 percent of the profits and losses to the general partners. Taxpayers assign error to all three holdings.

## LEGAL STANDARDS

Pursuant to ORS 316.007, we apply federal tax laws and federal court interpretations of those laws in resolving the issues raised by taxpayers. ORS 316.007 provides, in part:

"It is the intent of the Legislative Assembly * * * to make the Oregon personal income tax law identical in effect to the provisions of the federal Internal Revenue Code relating to the measurement of taxable income of individuals * * *; to achieve this result by application of the various provisions of the federal Internal Revenue Code relating to the definition of income, exceptions and exclusions therefrom, deductions (business and personal), * * * basis, depreciation and other pertinent provisions relating to gross income as defined therein, modified as provided in this chapter, resulting in a final amount called 'taxable income' * * *."

Additionally, ORS 316.032(2) provides that, insofar as is practicable in the administration of ORS chapter 316, "the department shall apply and follow the administrative and judicial interpretations of the federal income tax law." *See also Baisch v. Dept. of Rev.*, 316 Or 203, 209, 850 P2d 1109 (1993) (Oregon courts apply federal tax laws and federal court interpretations of those laws).

■       It is well established that taxes are to be based on the "objective economic realities of a transaction rather than * * * the particular form [that] the parties employed." *Frank Lyon Co. v. United States*, 435 US 561, 573, 98 S Ct 1291, 55 L Ed 2d 550 (1978). A taxpayer seeking relief from a decision of the Department has the burden of proving by a preponderance of the evidence that a claimed deduction is allowable. *Reed v. Dept. of Rev.*, 310 Or 260, 264, 798 P2d 235 (1990).

## FAIR MARKET VALUE

In their first assignment of error, taxpayers contend that the Tax Court erred in holding that the purchase price of $1,850,600 for Fischer Court I exceeded its fair market value. According to the Tax Court, the purchase price did not reflect the fair market value, because it was inflated in a manner that was acceptable both to sellers and buyers: For tax purposes, sellers would report only the gains they actually received on the transaction, not the price that taxpayers paid. Taxpayers, through the use of nonrecourse debt, agreed to a high purchase price in order to reap large depreciation deductions.

Taxpayers read *Kem v. Dept. of Rev.*, 267 Or 111, 114, 514 P2d 1335 (1973), for the proposition that, in Oregon, "the price paid in a voluntary, arm's-length transaction between a buyer and a seller, both of whom are knowledgeable and willing" is the most persuasive evidence in determining fair market value. Taxpayers contend that the evidence is "compelling" in this case that the purchase price established the fair market value of Fischer Court I. The Department responds that the Tax Court did not err in considering factors other than the purchase price in determining the fair market value of Fischer Court I.

A recent sale of property is "very persuasive" in determining the property's fair market value, if the sale was a voluntary, arm's-length transaction between a knowledgeable and willing buyer and seller. *Id.* at 114. Whether the parties to a sales transaction acted voluntarily, knowledgeably, willingly and at arm's length are factual questions. *Freedom Fed. Savings and Loan v. Dept. of Rev.*, 310 Or 723, 727, 801 P2d 809 (1990). However, purchase price "is not necessarily determinative of market value." *Kem*, 267 Or at 115. The purchase price as evidence of fair market value is subject to being discredited by "special considerations." *Equity Land Res. v. Dept. of Rev.*, 268 Or 410, 415, 521 P2d 324 (1974); *see also Durkin v. C.I.R.*, 872 F2d 1271, 1276 (7th Cir), *cert den* 493 US 824 (1989) (when debt used to purchase an asset is unlikely to be paid by the taxpayer, the debt does not represent a bona fide capital investment and will be excluded from the depreciable basis of the asset).

In this case, the only disputed question of fact before the Tax Court was whether the sales of the apartment complexes to taxpayers were arm's-length transactions. The Tax Court found by a preponderance of the evidence that they were, but concluded that "use of nonrecourse debt may produce an excessive price even in an arm's-length transaction." Consequently, the court considered valuation factors other than the purchase price[2] and concluded that the fair market

---

[2] The valuation factors that the Tax Court took into account were the assessed value of the property, the amount of the other offers the sellers received, the fact that the sale was made subject to Housing and Urban Development (HUD) regulations, and valuation based on income, cost and sales approaches.

value of Fischer Court I was $730,000. The question before this court is whether the Tax Court erred as a matter of law when it considered valuation factors other than purchase price in determining the fair market value of Fischer Court I and the other properties. For the reasons that follow, we conclude that nonrecourse financing is a special consideration that justifies considering factors other than purchase price in determining fair market value.

The cost basis of property to a buyer includes the amount of liabilities assumed, or taken subject to, by the buyer. *Brannen v. C.I.R.*, 722 F2d 695, 701 (11th Cir 1984) (citing *Crane v. Commissioner*, 331 US 1, 67 S Ct 1047, 91 L Ed 1301 (1947)). Only genuine debt is included in the basis of property for tax purposes, and a property's basis is its fair market value. *Estate of Baron v. C.I.R.*, 798 F2d 65, 68 (2d Cir 1986). When the purchase price includes nonrecourse debt, the question arises whether the debt is genuine, because if the buyer defaults, the seller has no recourse against the buyer and must take back the property. Generally, if nonrecourse debt does not exceed the value of the property that secures it, the debt is genuine, because if the buyer defaults on the purchase, he or she will lose an asset that is worth more than the amount of the debt. However, if the nonrecourse debt exceeds the value of the securing asset, it is not genuine debt, because the buyer has no incentive to pay it. *Bailey v. C.I.R.*, 993 F2d 288, 292-93 (2d Cir 1993). It follows that, when the purchase price of property includes nonrecourse debt, the purchase price is not necessarily the most persuasive evidence of the property's fair market value. The use of nonrecourse debt to finance a transaction justifies consideration of factors other than purchase price in determining the fair market value of the property. *See id.* at 293 (in deciding whether a taxpayer had an incentive to pay a nonrecourse debt, a court must determine the value of the securing debt).

In this case, the purchase price for, and taxpayers' claimed basis in, Fischer Court I was $1,185,600. The entire debt—the downpayment of $188,914 and the residual note of $996,686—was nonrecourse. The Tax Court did not err in considering valuation factors other than the purchase price in determining the fair market value of Fischer Court I.

## DEPRECIATION

Next, taxpayers contend that the Tax Court erred in concluding that they had failed to support their claim that the remaining useful life of Fischer Court I was 15 years. They frame the question on appeal as whether "the use of the 15-year life for straight-line depreciation * * * was * * * justified by component depreciation." The Department responds that there is no legal authority for any of the techniques and procedures used by taxpayers in claiming that the remaining useful life of the property was only 15 years.

■■■■ A taxpayer has the burden of establishing the reasonableness of a depreciation deduction and must justify the method used. IRC § 167(a) (1985); *Reed*, 310 Or at 264. The method of depreciation that a taxpayer uses does not establish the remaining useful life of the asset being depreciated. Regardless of the depreciation method used, the taxpayer must establish the remaining useful life of the asset and, in doing so, is to consider a variety of factors. *See* Treas Reg § 1.167(a)-1(b) (stating the rule and identifying factors to be considered by taxpayer in determining remaining useful life).

■■■ In this case, taxpayers elected to use the straight-line method of depreciation. Under that method, the basis of property less its salvage value is tax deductible in equal annual amounts over the estimated useful life of the property. Treas Reg § 1.167(b)-1. Taxpayers declared 15 years as the remaining useful life of the property for purposes of calculating their depreciation deduction under the straight-line method.[3] The auditor concluded that 15 years was not appropriate under any method allowed in Oregon for establishing remaining useful life and adjusted the remaining useful life to 30 years.

---

[3] The properties at issue in this appeal were in use before Oregon adopted the federal Accelerated Cost Recovery System (ACRS). *See* OAR 150-317.368(1) (In 1984, Oregon adopted ACRS but only for property placed into service on or after January 1, 1985.). Consequently, the former system, Class Life Asset Depreciation Range system (ADR), Rev Proc 72-10, 1972-1 CB 721, was available for use by taxpayers to establish the remaining useful life of the properties. However, taxpayers elected not to use the ADR system. Consequently, they were required to determine the remaining useful life of the properties through consideration of the factors listed in Treas Reg § 1.167(a)-1(b).

Taxpayers could not recall how they arrived at 15 years as the remaining useful life of Fischer Court I. Therefore, they employed an accountant to justify to the Tax Court why they were entitled to claim 15 years. They contend that the accountant used the component method of depreciation and that, under that method, the remaining useful life of the properties is 15 years.

We reject taxpayers' argument. As noted above, a depreciation method does not establish a property's remaining useful life. Even assuming that taxpayers were entitled to use the component method of depreciation—an assumption that the Department disputes—use of that method could not establish the remaining useful life of the properties. The Tax Court did not err in affirming the Department's determination that the properties have a remaining useful life of 30 years, because taxpayers failed to establish the reasonableness of a 15-year remaining useful life for purposes of their depreciation deductions.

## ALLOCATION OF PROFITS AND LOSSES

■ Finally, taxpayers contend that the Tax Court erred in holding that, as to their 1985 tax returns, they were not entitled to allocate 99.9 percent of their losses to the general partners and one-tenth of one percent of their losses to the initial limited partner. The Tax Court held that the only written agreements regarding allocations of profits and losses unambiguously prevent such an allocation. Taxpayers contend that Section 8.1 of the Amended and Restated Articles of Limited Partnership (amended articles) authorizes them to allocate profits and losses among the general and original or substituted limited partners as they "may agree" before admission of the investor limited partners. According to taxpayers, they and the substitute limited partner agreed to the 1985 allocation. The Department responds that, under Section 1.5.1 A of the Articles of Limited Partnership (articles) and amended articles, taxpayers were entitled to claim only two percent of the profits and losses on the 1985 tax returns. For the reasons that follow, we conclude that the Tax Court did not err.

The articles, adopted on September 10, 1984, stated that taxpayers were general partners and that Rockwood

Development Corporation (Rockwood) was the initial limited partner. Section 1.5.1 A of the articles allocated two percent of the net operating profits and losses to the general partners and 98 percent of the profits and losses to the limited partners. Section 8.1 of the articles provided, in part:

"Net Operating Profits and Losses and Net Cash Distributions from Operations (after payment of all fees) shall be distributed to the Limited Partners (pro rata in the relationship of the number of Units held by each) and the General Partners (divided among them as they agree) *as stated in Section 1.5.1.*" (Emphasis added.)

A statement next to the signatures of the general partners declared that the general partnership held 100 percent of the partnership interests. A statement next to signature of the initial limited partner declared that the limited partnership held one-tenth of one percent of the limited partnership interests. American Properties Corporation (APC) subsequently was substituted as a limited partner for Rockwood. Thereafter, taxpayers and APC signed the amended articles, under which APC withdrew as a limited partner. Section 1.5.1 A of the amended articles allocates one percent of the net operating profits and losses to the general partners and 99 percent of the profits and losses to the limited partners. Section 8.1 of the amended articles provides:

"Prior to the admission of the Investor Limited Partners pursuant to Section 6.3, Operating Profits and Losses shall be allocated among the General Partners and the Original Limited Partner as they may agree."

Statements identical to those appearing next to the signatures of the general and limited partners in the articles appeared next to the signatures of the general and limited partners in the amended articles. "Schedule A," which was appended to the amended articles, contained a list of the names of 21 new limited partners.

Relying on the wording in Section 8.1 of the amended articles, taxpayers and APC agreed to allocate profits and losses for the 1985 tax year based on the statements of ownership that appeared next to the signature lines of the general and limited partners. In analyzing taxpayers' claim that Section 8.1 of the amended articles authorized them to

allocate profits and losses as they and the limited partner "may agree" before admission of the investor limited partners, the Tax Court noted that the amended articles contained "no signatures for the 21 limited partners." The absence of the signatures of the new limited partners is not without legal significance.

The formation and amendment of a limited partnership is governed by statute. ORS 69.180(1) (1983) describes the procedure required for forming a limited partnership that was in effect when taxpayers' limited partnership was formed and amended. It provides, in part, that when two or more persons desire to form a limited partnership they shall "[s]ign and verify a certificate" and shall "[f]ile one copy of such certificate in the office of the Corporation Commissioner." Taxpayers followed that procedure with respect to the articles, evidence of which was introduced to the Tax Court as an exhibit. ORS 69.410(1) (1983) describes the procedure required to amend a certificate of limited partnership to change a limited partnership's composition. That statute provides that the writing to amend a certificate of limited partnership shall:

> "Be signed and verified by all partners. An amendment substituting a limited partner or adding a limited or general partner shall be signed also by the partners to be substituted or added. When a limited partner is to be substituted, the amendment shall also be signed by the assigning limited partner." ORS 69.410(1)(b).

The only evidence regarding the amended articles that taxpayers submitted to the Tax Court was a document signed by taxpayers and the president of APC. There is no evidence in this record that the amended articles were signed by the 21 new limited partners, as required by statute, or that the general partners exercised a power of attorney to sign on behalf of the investor limited partners. *See* ORS 69.180(1)(a)(R) (stating right of general partner to sign amended certificate for limited partner if given power of attorney). Thus, the amended articles were not properly executed. Consequently, taxpayers were not entitled to rely on Section 8.1 of the amended articles for the purposes of allocating profits and losses on their 1985 tax returns. The only document that conforms to the statutory requirements and

that is binding is the articles. Section 1.5.1 A of the articles unambiguously allocates two percent of the losses to the general partners and 98 percent of the losses to the limited partners. The Tax Court did not err in holding that, with respect to their 1985 tax returns, taxpayers were not entitled to allocate 99.9 percent of their losses to the general partners and one-tenth of one percent of their losses to the initial limited partner.

The judgment of the Tax Court is affirmed.