PETITIONERS APPEARING PRO SE:
**VASSIL MARINOV**
**VENETKA MARINOVA**
West Lafayette, IN

ATTORNEYS FOR RESPONDENT:
**CURTIS T. HILL, JR.**
ATTORNEY GENERAL OF INDIANA
**ALEKSANDRINA P. PRATT**
**ZACHARY D. PRICE**
DEPUTY ATTORNEYS GENERAL
Indianapolis, IN

FILED
Feb 20 2019, 3:55 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# INDIANA TAX COURT

| | |
|---|---|
| VASSIL MARINOV & <br> VENETKA MARINOVA, <br><br> Petitioners, <br><br> v. <br><br> TIPPECANOE COUNTY ASSESSOR, <br><br> Respondent. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Cause No. 17T-TA-00023 <br> ) <br> ) <br> ) <br> ) <br> ) |

ON APPEAL FROM A FINAL DETERMINATION
OF THE INDIANA BOARD OF TAX REVIEW

**FOR PUBLICATION**
**February 20, 2019**

WENTWORTH, Judge

Vassil Marinov and Venetka Marinova (Marinovs) challenge the final determination of the Indiana Board of Tax Review that established the assessed value of their real property for the 2014 tax year. Upon review, the Court affirms the Indiana Board's final determination.

**FACTS AND PROCEDURAL HISTORY**

The Marinovs own a 3,090 square foot, single-family home situated on a 0.3064 acre lot in the Wake Robin subdivision in West Lafayette. (Cert. Admin. R. at 190-91.) When the Marinovs purchased the subject property in 2004, its assessed value was $205,200, with $36,900 allocated to the land and $168,300 to the improvements. (Cert. Admin. R. at 66, 191-92.)

In 2006, the property's assessed value increased to $216,200, which the Marinovs appealed requesting that it be reduced to $172,000. (Cert. Admin. R. at 192.) Although the Tippecanoe County Property Tax Assessment Board of Appeals (PTABOA) and the Indiana Board ultimately denied the 2006 appeal, the Assessor reduced the property's assessed value to $173,200 for the 2007 tax year based on an appraisal the Marinovs presented during the 2006 appeal process. (Cert. Admin. R. at 192, 194.) To achieve that value, the Assessor applied a 24% obsolescence adjustment to the property.[1] (See Cert. Admin. R. at 194-95, 278-79.)

During tax years 2008-2013, the property's assessed value ranged from $169,600 in 2008 to $149,000 in 2013. (Cert. Admin. R. at 194.) In 2014, the Assessor removed the obsolescence factor and assigned a $187,700 assessed value, resulting in an assessed value 26% higher than that in 2013. (See Cert. Admin. R. at 196.) Believing

---

[1] Obsolescence, a type of depreciation, can be either functional or external. See 2011 REAL PROPERTY ASSESSMENT GUIDELINES (incorporated by reference at 50 IND. ADMIN. CODE 2.4-1-2 (2014)), App. B. at 3. Functional obsolescence is a loss in value "caused by some type of inutility within [a] structure and materials or design that diminishes the ability of the structure to perform the function for which it was constructed [or] . . . used." Id. External obsolescence is an "impairment in the utility or salability of [a] structure due to negative influences that occur outside the property." Id.

the 2014 assessed value to be too high, the Marinovs appealed first to the PTABOA and thereafter to the Indiana Board.

On August 9, 2017, the Indiana Board conducted a hearing on the Marinovs' appeal. The Indiana Board explained that because the property's assessed value increased by more than 5%, the Assessor bore the burden of proof in the administrative process.[2] (See Cert. Admin. R. at 120 ¶ 21, 180-81.) To meet his burden of proof, the Assessor presented an estimate of value using the sales comparison approach[3] and a time trend analysis to show that the original 2014 assessed value actually undervalued the property. (See Cert. Admin. R. at 71-83, 183-86, 245-46.)

The Assessor's sales comparison approach compiled sales information from seven, two-story houses within a 1400-foot radius of the subject property that sold between January 1, 2013 and December 31, 2013. (Cert. Admin. R. at 71-72, 197-98.) To account for differences between the subject property and the comparable properties, the Assessor developed a linear regression model based on 101 property sales in the Wake Robin subdivision from 2009-2016.[4] (See Cert. Admin. R. at 73-82, 203-12.)

---

[2] Indiana Code § 6-1.1-15-17.2 provides that if the assessment of the same property increases by more than 5% from one year to the next, the assessor bears the burden of proving that the assessment is correct. See IND. CODE § 6-1.1-15-17.2 (2017).

[3] The sales comparison approach is a generally accepted appraisal method used to determine a property's market value-in-use and, specifically, "estimates the total value of the property directly by comparing it to similar, or comparable, properties that have sold in the market." 2011 REAL PROPERTY ASSESSMENT MANUAL (incorporated by reference at 50 I.A.C. 2.4-1-2) at 2.

[4] In support of this methodology, the Assessor referred to Uniform Standards of Professional Appraisal Practice (USPAP) advisory opinions, which indicate that the linear regression model is a generally accepted appraisal practice when valuing an individual property. (See Cert. Admin. R. at 84-94, 217-23 (citing USPAP Advisory Opinions Nos. 18, 23).) The linear regression model uses multiple variables to quantify differences in value between comparable properties and a subject property by determining which characteristics of the property most affect its value. (See Cert. Admin. R. at 84-94, 203-12.)

Applying that analysis, the Assessor determined that the time of sale, age, grade, living area, and garage size were the most relevant factors affecting the subject property's value and then adjusted the seven comparable properties according to the differences in those characteristics. (See Cert. Admin. R. at 73-82, 206-15.) As a result, the Assessor's sales comparison approach estimated an assessed value of $237,400. (See Cert. Admin. R. at 71, 215.)

In addition, the Assessor used sales information from the 101 linear regression properties to develop a time trend analysis, which shows the percentage change in the price per square foot over a specified time period. (Cert. Admin. R. at 83, 244-46.) The time trend analysis indicated that the value of properties in the Wake Robin subdivision increased by 22.29% from the subject property's purchase date of July 23, 2004, to the 2014 assessment date. (Cert. Admin. R. at 83, 244-46.) Applying that percentage to the subject property's $166,000 purchase price resulted in an assessed value estimate of $203,000 for 2014. (See Cert. Admin. R. at 83, 245-46.)

Finally, the Assessor examined the sales data from the linear regression properties to ensure that the 2014 assessed value was reasonable. The Assessor testified that the subject property's 2014 assessed value of $187,700 correlates to a sale price of approximately $61 per square foot, which was within the range of the market sales in the Wake Robin subdivision or even a bit lower. (See Cert. Admin. R. at 83, 247-48.) In comparison, the Marinovs' proposed 2014 assessed value of $149,000 equates to $48 price per square foot, a price below all of the 101 sales. (See Cert. Admin. R. at 83, 247-48.) As a result, the Assessor removed the 24% obsolescence adjustment that had reduced the value of the Marinovs' property and determined that his 2014 assessed value

4

brought the Marinovs' valuation in line with the other comparable properties in their neighborhood. (See Cert. Admin. R. at 247-48, 276-77.)

The Marinovs, on the other hand, presented a list of property assessments in the Wake Robin subdivision showing that other property assessments in that neighborhood had only increased by 0%-2% between 2013 and 2014 but their assessment increased by 26%.[5] (See Cert. Admin. R. at 60-62, 260-64.) The Marinovs argued that such a large increase in their assessed value must be incorrect. (See Cert. Admin. R. at 263-66.)

On November 6, 2017, the Indiana Board issued its final determination upholding the assessment, finding that the Assessor established a prima facie case that the assessment was correct and that the Marinovs failed to rebut the Assessor's evidence. (Cert. Admin. R. at 116, 123-24 ¶ 24(g), 125 ¶ 25.) On December 21, 2017, the Marinovs initiated this original tax appeal. The Court took the matter under advisement on November 29, 2018. Additional facts will be supplied as necessary.

## STANDARD OF REVIEW

The party seeking to overturn an Indiana Board final determination bears the burden of demonstrating its invalidity. Osolo Twp. Assessor v. Elkhart Maple Lane Assocs., 789 N.E.2d 109, 111 (Ind. Tax Ct. 2003). Thus, to prevail on appeal, the Marinovs must demonstrate to the Court that the Indiana Board's final determination is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege or immunity; in excess of or short of statutory jurisdiction, authority, or limitations; without observance of the procedure

---

[5] The Marinovs argue that their property's improvement value increased by 35%. (See Cert. Admin. R. at 260-64.) The subject property's total assessed value increased by 26%, not 35%. (See Cert. Admin. R. at 64, 196.)

5

required by law; or unsupported by substantial or reliable evidence. See IND. CODE § 33-26-6-6(e)(1)-(5) (2019).

## ANALYSIS

The Marinovs assert on appeal, just as they did at the administrative hearing, that their assessment is incorrect because 1) the Assessor did not inspect their property or account for the property's true condition, 2) the property has not physically changed since 2012,[6] and 3) between 2013 and 2014, other property assessments in the area increased by no more than 2%, while theirs increased by 26%. (Compare generally Pet'r Br. with Cert. Admin. R. at 250-64.) None of these arguments, however, are persuasive.

First, an assessor is not required to inspect real property before issuing an assessment, unless it is a general reassessment year – and 2014 was not. See IND. CODE § 6-1.1-4-4.2(a), (c) (2014). See also IND. CODE § 6-1.1-4-4.5 (2014) (amended 2016). Instead of inspecting every property, assessors annually adjust property values using a trending process and a specified adjustment factor. See I.C. § 6-1.1-4-4.5. Therefore, this argument does not support invalidating the assessment.

Second, the Marinovs claim that the Assessor should have valued their property at its 2012 assessed value of $149,000 because the property had not changed since that time. Property values, however, do not change solely based on physical changes to the property over time. Rather, property values can fluctuate each year for a variety of reasons, including factors extrinsic to the property. See Marion Cty. Assessor v.

---

[6] Although the Marinovs claim a judge reduced their property's 2012 assessed value from $180,000 to $149,200, the Court found no evidence to support their assertion in the certified administrative record. (See Cert. Admin. R. at 256-59.) In fact, the property record card itself contradicts their claim because it contains no reference to this alleged decrease in the 2012 assessed value. (See Cert. Admin. R. at 64-65.)

Washington Square Mall, LLC, 46 N.E.3d 1, 11, (Ind. Tax Ct. 2015) ("In the world of property assessment, property values fluctuate annually with changes in the market") (citation omitted). Accordingly, the fact that the subject property itself has not physically changed does not necessarily mean that its value remains the same. Moreover, as the Court has often noted, each assessment year stands alone. See, e.g., Fleet Supply, Inc. v. State Bd. of Tax Comm'rs, 747 N.E.2d 645, 650 (Ind. Tax Ct. 2001), review denied; Barth, Inc. v. State Bd. of Tax Comm'rs, 699 N.E.2d 800, 805 n.14 (Ind. Tax Ct. 1998) ("[w]here a taxpayer challenges an assessment, the resolution of that challenge does not depend on how the property was previously assessed"). Thus, the Marinovs' second argument also fails.

Finally, the Marinovs challenge their property's assessed value because it increased far more than that of the other properties in their subdivision. To support their claim, the Marinovs presented the Indiana Board with a list of property assessments within the Wake Robin subdivision, showing a 0%-2% change in assessed values for most properties between 2013 and 2014.

To demonstrate the market-value-in-use of a property, a taxpayer may introduce evidence of the assessments of any relevant, comparable properties. See IND. CODE § 6-1.1-15-18(c)(1) (2014). "The determination of whether properties are comparable shall be made using generally accepted appraisal and assessment practices." I.C. § 6-1.1-15-18(c).

Other than asserting that their list of properties also were located in the Wake Robin subdivision, the Marinovs offered no evidence compliant with generally accepted appraisal and assessment practices to demonstrate the similarities between those

7

properties and the subject property. (See Cert. Admin. R. at 60-62, 249-78.) As this Court has previously explained, "[g]eneral statements that another property is 'similar' or 'comparable' simply because it is on the same street are nothing more than conclusions . . . [and] do not constitute probative evidence." Blesich v. Lake Cty. Assessor, 46 N.E.3d 14, 17 (Ind. Tax Ct. 2015) (citation omitted). Consequently, the comparability of the Marinovs' listed properties is unknown, and their list of property assessments has no probative value.

The evidence in the record demonstrates that a significant amount of the increase in the subject property's 2014 assessed value is attributable to the removal of the obsolescence adjustment first applied to the property in 2007. (See Cert. Admin. R. at 64, 66-67, 194-95, 276-77.) The Assessor testified that he removed the obsolescence adjustment to bring the Marinovs' assessment more in line with other properties in the neighborhood, and he presented evidence of the property's market value-in-use to support its removal.

The Marinovs did not properly rebut the Assessor's removal of the obsolescence adjustment because they failed to both identify causes of the purported obsolescence and to quantify the amount of obsolescence they claim should be applied. See Hometowne Assocs., L.P. v. Maley, 839 N.E.2d 269, 273-74 (Ind. Tax. Ct. 2005) (indicating that the party seeking an obsolescence adjustment must make the two-pronged evidentiary showing identifying and quantifying the obsolescence). Instead of providing evidence identifying defects and quantifying the amount of obsolescence to be applied, the Marinovs testified that when they purchased the property in 2004, it had some "serious defects" that would cost "about $70,000" to fix. (See Cert. Admin. R. at 251-52.)

8

Without more, these statements are too remote in time and conclusory in nature to be probative. See Long v. Wayne Twp. Assessor, 821 N.E.2d 466, 470 (Ind. Tax Ct. 2005) ("[c]onclusory statements do not constitute probative evidence") (citation omitted), review denied. Therefore, based on the market-based evidence above, the Assessor properly removed the obsolescence adjustment to reflect the subject property's market-value-in-use.

## CONCLUSION

The Assessor established a prima facie case that the 2014 assessed value of the subject property was correct. The Marinovs failed, however, to successfully rebut the Assessor's prima facie case. Accordingly, the Court affirms the Indiana Board's final determination.