PETITIONERS APPEARING PRO SE:
**LINDA DONOVAN**
Jeffersonville, IN

**WILLIAM DONOVAN**
Jeffersonville, IN

ATTORNEY FOR RESPONDENT:
**AYN K. ENGLE**
ATTORNEY AT LAW
Indianapolis, IN

FILED

Dec 22 2025, 2:05 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



# IN THE
# INDIANA TAX COURT

| | | |
|---|---|---|
| LINDA DONOVAN and WILLIAM DONOVAN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 25T-TA-00002 |
| | ) | |
| CLARK COUNTY ASSESSOR, | ) | |
| | ) | |
| Respondent. | ) | |

## ON APPEAL FROM A FINAL DETERMINATION OF
## THE INDIANA BOARD OF TAX REVIEW

**FOR PUBLICATION**
**December 22, 2025**

MCADAM, J.

Linda Donovan and William Donovan, appearing *pro se,* appeal the Indiana Board of Tax Review's final determination that increased the 2023 assessment of their condominium to match the price they paid to purchase it just over four months before the assessment date. The Donovans challenge the Board's determination as a matter of law and fact, arguing that their purchase price could not serve as reliable valuation evidence. Instead, they provide evidence from the sales of other condos but do not compare them to their own property. After reviewing the certified record, the Court is not

persuaded that the Board's decision was erroneous. There is no legal impediment to the use of a property's purchase price to value the property, and the totality of the evidence in the record here can support the Board's inference of assessed value.

## FACTS AND PROCEDURAL HISTORY

The Donovans own a condominium unit located in Jeffersonville, Indiana, within a complex known as The Harbours. The property is on the 11th floor—the top floor of the building. The Donovans purchased this property on August 24, 2022, for $810,000.

For the January 1, 2023, assessment date, the Donovans' property was assessed at $700,000, which was approximately $300,000 more than the prior year. The increased assessment led the Donovans to initiate an appeal. The Donovans appealed first to the Clark County Property Tax Assessment Board of Appeals ("PTABOA"), which affirmed the original assessed value for 2023. The Donovans then appealed to the Indiana Board of Tax Review.

At the hearing before the Indiana Board, the Assessor had the burden of proof because the assessment had increased by more than 5% over the prior year and so presented first. The Assessor presented the property record card for the subject property as well as the Sales Disclosure Form and MLS listing detailing the August 24, 2022, purchase of the condo by the Donovans.[1] The Assessor presented testimony from an assessor-appraiser, who testified that the August 2022 sale was an arm's-length transaction, was valid to be used in the trending process for the 2023

---

[1] A sales disclosure form is a document detailing a property sale that must be filed with the county auditor after transferring real property in a sale. *See generally* IND. CODE §§ 6-1.1-5.5-3, -5. MLS stands for "multiple listing service" and acts as a private database for sharing property listings and storing information about them. *See* NATIONAL ASSOCIATION OF REALTORS, *Multiple Listing Services (MLS): What Is It*, available at https://www.nar.realtor/mls-online-listings/multiple-listing-service-mls-what-is-it (last visited December 18, 2025).

assessment, and was representative of the market value-in-use of the property as of January 1, 2023.

The Donovans presented evidence including sales and assessment data for other units in The Harbours building, property record cards, photographs, and information from the 2023 Clark County real property assessment records. The Donovans argued that their evidence indicated an assessed value of $558,800 for their unit and showed an unconstitutional lack of uniformity in their assessment when compared to others in their complex. They also contended that the Assessor's evidence was not sufficient to prove the market value-in-use of their condo.

In its final determination, the Board ordered the 2023 assessment increased to $810,000 in accordance with Indiana Code § 6-1.1-15-20. The Board concluded that the totality of the evidence submitted by the parties supported a finding that the Donovans' $810,000 purchase price represented the property's true tax value as of January 1, 2023. The Board also found that the Donovans failed to prove a lack of uniformity and equality in the assessment.

## STANDARD OF REVIEW

This Court's review of Indiana Board decisions is governed by Indiana Code § 33-26-6-6, which closely mirrors the language governing judicial review of administrative decisions from Indiana's Administrative Orders and Procedures Act. *Compare* IND. CODE § 33-26-6-6(e) (2025), *with* IND. CODE § 4-21.5-5-14(d) (2025). Under Indiana Code § 33-26-6-6, the party seeking to overturn a final determination of the Board bears the burden of demonstrating its invalidity. IND. CODE § 33-26-6-6(b). Challengers must demonstrate that they have been prejudiced by a final determination

3

of the Board that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of or short of statutory jurisdiction, authority, or limitations; without observance of the procedure required by law; or unsupported by substantial or reliable evidence. IND. CODE § 33-26-6-6(e). The Board's legal conclusions are reviewed *de novo* and its factual determinations are afforded deference when they are supported by substantial and reliable evidence. *Majestic Props., LLC v. Tippecanoe Cnty. Assessor*, 241 N.E.3d 642, 644 (Ind. Tax Ct. 2024).

**DISCUSSION**

The Donovans claim that the Board's final determination is contrary to law, unsupported by substantial evidence, an abuse of discretion, and a violation of the Indiana Constitution's guarantee of uniform and equal assessments. They make four arguments based on these assertions: First, they contend the Board's decision is contrary to law, arguing that the purchase price of a property is distinct from its market value-in-use and cannot prove the property's true tax value without other supporting evidence. Second, they contend that, even if their condo's purchase price could be used to prove true tax value, the Board's decision is unsupported by substantial evidence because the evidence in the record contains factual errors and fails to account for the circumstances surrounding the sale and its proximity to the valuation date. Third, they contend that the Board's decision is an abuse of discretion because the totality of the evidence compels an alternative assessment of $558,800. Fourth, and finally, they contend that, even if the Board's valuation is supported by the evidence, the resulting assessment creates a lack of uniformity and equality in violation of the Indiana

4

Constitution's Property Tax Clause, Article 10, Section 1. Ultimately, each of these four arguments fail, as the Donovans did not accurately apply Indiana law or demonstrate that the evidence in the record compelled a different result. As such, the Court affirms the Board's determination.

### I.      The Board's reliance on the purchase price was not contrary to law

The Donovans raise two arguments as part of their first claim that the Board's reliance on the purchase price of the Donovans' condo was contrary to law: (1) They argue that the purchase price represents the fair market value of the condo rather than the market value-in-use, which is the standard for Indiana assessments. (2) They argue that this Court has held that the purchase price of a property, standing alone, is not sufficient to support an inference of value for the property. Both arguments, however, misapprehend the law.

### A.      Fair market value and market value-in-use may converge when the pre- and post-sale uses of a property are the same

The first contention—that the purchase price of a property cannot be used to value that property because the price reflects the property's fair market value while Indiana's assessment system is founded on market value-in-use—fails to account for circumstances where fair market value converges with market value-in-use. When such a convergence occurs, a recent purchase of the property can reflect a property's value-in-use.

Although true tax value does not mean "fair market value," IND. CODE § 6-1.1-31-6(c), regulations governing Indiana assessments acknowledge that true tax value and market value overlap when there are regular exchanges of a

type of property for its current use. *See* 2021 REAL PROPERTY ASSESSMENT MANUAL ("2021 Manual") (incorporated by reference at 50 IND. ADMIN. CODE 2.4-1-2 (2020)) at 2. Property assessments in Indiana are based on "true tax value," IND. CODE § 6-1.1-31-6(b)(6), which simply means "[t]he market value-in-use of a property for its current use." 2021 Manual at 2. Put differently, a property's market value-in-use is "the price that would induce the owner to sell the real property and . . . the buyer would purchase the real property for a continuation of the use of the property for its current use." *Id.* Market value focuses instead on the price resulting from a property's "reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest," regardless of the property's pre- or post-sale use. 2021 Manual at 6. Market value-in-use therefore emphasizes the specific use of the property, while fair market value does not. When the use of the property before and after its sale is the same, fair market value and market value-in-use can converge when there are regular exchanges of the same type of property, ensuring a competitive market. *See generally* THE APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE 48–53 (15th ed. 2020) (defining, comparing, and contrasting market value, fair value, use value, and market value-in-use).

Here, the record firmly supports the Board's determination that the Donovans' purchase price represented the market value-in-use of the property. The determination of whether a sale represents the market value-in-use of a piece of property is a factual question because it turns, at least in part, on a comparison of the use of the property before and after sale. The Donovans do not claim that they used the condo for a

6

different purpose than the previous owner. The record shows that both the Donovans and the seller used the condo for a residential purpose. (*See* Cert. Admin. R. at 74, 128; *see also* Cert Admin. R at 38 (showing that condo was classified as owner-occupied homestead property for tax cap purposes beginning in 2018).) The Donovans also do not argue that the purchase and sale of condos similar to the subject property are uncommon. The extensive sales evidence in this case suggests that condos in the Donovans' building are regularly exchanged in the open market. The Donovans fail to identify any evidence that would suggest that their purchase of the subject property was not representative of a convergence of fair market value and market value-in-use.[2]

**B.      This Court's precedent does not preclude the use of a property's purchase price to value the property**

The second contention is that existing precedent precludes the use of the purchase price of a property to value that property, pointing to this Court's decision in *Hubler Realty Co. v. Hendricks Cnty. Ass'r*, 938 N.E.2d 311 (Ind. Tax Ct. 2010). The Donovans argue that the purchase price of the property at issue in *Hubler* was "only persuasive because it was accompanied by appraisals, supporting testimony, and documentation of utility to the buyer." (Pet'rs' Reply at 6.) They maintain that "a property's sale price may be indicative of market value-in-use only if it results from an arm's-length transaction and is supported by credible and probative evidence." (Pet'rs' Reply at 6 (emphases removed).)

---

[2] Residential sales are regularly used when determining true tax value for Indiana taxation purposes. *See, e.g.*, *Bougie v. Chapman*, 244 N.E.3d 987, 991–92 (Ind. Tax Ct. 2024) (affirming Board's value determination that relied on comparing recently-sold homes near the subject property); *DuSablon v. Kaufman*, 160 N.E.3d 587, 589 (Ind. Tax Ct. 2020) (same); *Marinov v. Tippecanoe Cnty. Assessor*, 119 N.E.3d 1152, 1154 (Ind. Tax Ct. 2019) (same).

The Donovans are correct that *Hubler* does not automatically make the purchase price of a property determinative of assessed value, but they wrongly infer restrictions on the use of such evidence that are not found in the Court's decision. *Hubler* never reached the question of whether the purchase price of a property could support an inference of value for the same property. The question before the Court in *Hubler* was whether the evidence indicated that the assessor in that case had engaged in the practice of selective reappraisal and sales chasing.[3] *Hubler*, 938 N.E.2d at 313. The Court concluded that the evidence did not support such a finding. *Id*. at 315. The Court also held that the use of the property's purchase price by the PTABOA and the Board to determine the value of the property as part of an administrative assessment appeal did not amount to selective reappraisal or sales chasing. *Id*. Neither of these questions required the Court to consider the probative value of a property's purchase price in determining the property's value.

The price paid for a property can be used to prove the value of that property. *See, e.g.*, *Pachniak v. Marshall Cnty. Assessor*, Case No. 49T10-0904-TA-18, 2010 WL 2284248, *2 (Ind. Tax Ct. June 8, 2010) (finding purchase price of subject property "evidence as to its actual value" for purposes of assessment). But like any other sale offered to prove value, the extent of a purchase price's persuasiveness turns on the facts and circumstances surrounding the sale. These facts and circumstances must be

---

[3] "Sales chasing, also known as selective reappraisal, is the practice of selectively changing values for properties that have been sold, while leaving other values alone . . . . [s]elective reappraisal cases have been characterized as those in which either one taxpayer or a small group of taxpayers are singled-out for revaluation or for first-time assessment when similar property is not assessed for any additional tax liability." *Big Foot Stores LLC v. Franklin Twp. Assessor*, 919 N.E.2d 621, 623 n.5 (Ind. Tax Ct. 2009) (internal citations and quotations omitted).

evaluated to determine whether they permit an inference that the purchase price is representative of market value-in-use at the time of assessment. *See, e.g.*, *Millennium Real Est. Inv., LLC v. Assessor, Benton Cnty.*, 979 N.E.2d 192, 194–95 (Ind. Tax Ct. 2012) (rejecting previous purchase prices for a property for various reasons, including that a sale involved related parties and that a sale related to a foreclosure), *trans. denied*; *cf. Shepard v. Clatsop Cnty. Assessor*, No. TC-MD 170163R, 2018 WL 1299284, at *3, *8–9 (Or. Tax Ct. Mar. 13, 2018) (finding the purchase price of a home unpersuasive because the home was not adequately marketed and was immediately relisted after purchase for nearly double the purchase price). In this regard, the purchase price of the subject property may represent the best indication of value for that property because it eliminates the need to adjust for differences between the subject and comparison properties.[4]

Ultimately, both the probative and persuasive value of a property's sale in determining that property's market value-in-use is a factual question, not a legal one. Such questions are committed to the discretion and judgment of the finder of fact. *Hubler* placed no restrictions or corroboration requirements on the use of a property's purchase price to infer the value of that property. The Board, as the trier of fact, is best equipped to examine the evidence underlying the purchase price and determine whether the sale represents the market value-in-use of the subject property.

---

[4] This principle has been formalized in other jurisdictions, such as Oregon, where "[a] recent sale of property is 'very persuasive' in determining the property's fair market value, if the sale was a voluntary, arm's-length transaction between a knowledgeable and willing buyer and seller." *Miller v. Dep't of Revenue, State of Or.*, 958 P.2d 833, 837 (Or. 1998).

## II. The Board's value determination is supported by substantial evidence

Notwithstanding their arguments that the use of a purchase price to value a property was legally erroneous, the Donovans lodge an alternative claim that the Board's conclusion of value for their condo is unsupported by substantial evidence. The Donovans claim that the evidence of their purchase price contained three flaws that render it incapable of supporting the Board's value determination: (1) the MLS listing contained unverified and inaccurate data, (2) the purchase price was not adjusted for the time between the sale and the assessment date, and (3) the evidence failed to account for the Donovans' atypical motivations as buyers. While the evidence in the certified record may be imperfect, the Court will uphold the Board's decision if there is more than a mere scintilla of evidence to support the Board's findings. *See CVS Corp. v. Searcy*, 137 N.E.3d 1053, 1056 (Ind. Tax Ct. 2019). Here, the evidence is sufficient to support an inference that the Donovans' purchase of the subject property represented the market value-in-use of the property for the 2023 assessment date.

### A. Evidence relied upon by the Board to determine true tax value

The Donovans first note that the MLS listing contained incorrect data pertaining to the square footage and number of balconies for their condo. (Pet'rs' Reply at 8; *see* Cert. Admin. R. at 67–69, 78.) But they do not explain why these two inaccuracies preclude the Board from relying on the body of evidence surrounding the sale to infer a value. Determining the value of a property must often rely on imperfect market data. *See Madison Cnty. Assessor v. Kohl's Indiana, LP*, 268 N.E.3d 873, 884 (Ind. Tax Ct. 2025) (citing *Lake Cnty. Assessor v. O'Day Holdings*, LLC, 249 N.E.3d 677, 688 (Ind. Tax Ct. 2024), *opinion superseded on reh'g*, No. 24T-TA-00009, 2025 WL 3202637

10

(Ind. Tax Ct. Nov. 17, 2025). The Donovans do not identify factual errors in the other evidence detailing their purchase of the subject property, nor do they explain how these two errors in the MLS listing affected the price they paid for the property. The Board found the sale to be a "valid, arm's length transaction in which both parties were represented by realtors," which is sufficient to overcome the minor inaccuracies contained in the MLS listing. (Cert. Admin. R. at 108 ¶ 24.)

### B.      Difference between purchase date and assessment date

The Donovans next argue that the unique market conditions prevailing at the time they purchased the condo and the lapse of time between their August 2022 purchase and the January 1, 2023, assessment date deprive the sale price of persuasive value absent adjustments. In its final determination, the Board found that there was "no evidence showing a significant change in the market" between the sale date and the assessment date and concluded that the sale was "sufficiently close to the valuation date for it to be reliable evidence" of the condo's value as of the assessment date. (Cert. Admin R. at 108 ¶ 24.) Although the Donovans offered a different perspective in their testimony, the Board's finding is supported by the testimony of the Assessor's expert who testified that the August 24, 2022, purchase price was representative of the market value-in-use for the January 1, 2023, assessment date. This testimony combined with the fact that the sale occurred a little more than four months before the assessment date was sufficient to support an inference by the Board that the sale price reflected the value of the Donovans' condo on the assessment date.

11

## C.     The Donovans' personal considerations at time of purchase

The Donovans also challenge the Board's finding that their purchase is "reliable evidence of the subject property's true tax value" by arguing that they were atypically motivated buyers, which led them to pay a price that outpaced the market. (Cert. Admin. R. at 108, ¶ 24.) Because of their age and health issues, the Donovans claim that they decided against buying another similarly sized condo in the same complex that would have required several months of renovation. (*See* Cert. Admin. R. at 127:22–31.) But the Donovans provided no evidence suggesting that such motivations are atypical or demonstrating that such motivations affected the eventual sale price. *See DuSablon v. Kaufman*, 160 N.E.3d 587, 595 (Ind. Tax Ct. 2020) (rejecting taxpayer's claim that they overpaid for personal reasons because there was objective evidence that the purchase price resulted from an "open, competitive, fair, arm's-length transaction). Paying a premium for a fully renovated property does not seem at all unusual, and buyers are likely to be motivated by an array of factors when purchasing residential property.[5] Notwithstanding the Donovans' stated motivations, the Board was empowered to weigh that testimony against the other evidence of the sale.

Here, the record contains substantial evidence supporting the Board's determination that the sale was probative and reliable, as the sale bore many hallmarks of an arm's-length transaction: the buyer and seller were unrelated parties (*see* Cert. Admin. R. at 74–75, 124); both were represented by their own agents from different

---

[5] Paying a premium for a renovated space is not only usual but also accounted for in standard valuation approaches. "If the subject property requires some expenditure immediately after the purchase to reach its full utility, the adjustment amount is subtracted from the sale prices of all comparable sales that do not require a similar expenditure to adjust those transactions for differences from the subject property." THE APPRAISAL INSTITUTE, *supra*, at 386.

brokerages (*see* Cert. Admin R. at 125–26); the property was actively marketed on the MLS for 122 days (*see* Cert. Admin. R. at 78, 126); and the final sale price was negotiated down from the asking price (*see* Cert. Admin. R. at 80). There was also testimony from the Assessor's expert that the transaction appeared to be a valid arm's-length sale that was representative of the market value-in-use for the 2023 assessment date. (*See* Cert. Admin. R. at 124–25.) This evidence cuts against the Donovans' stated motivations and is capable of supporting a finding by the Board that the Donovans' purchase was not atypical. As such, the evidence is sufficient to support an inference that the Donovans' purchase was indicative of the property's true tax value.

### III. The evidence does not compel a different result

The Donovans contend that the Board abused its discretion by finding that the Donovans offered no reliable market-based evidence showing their condo's true tax value. On the contrary, the Donovans claim that they submitted evidence that conclusively demonstrates the value of their property in 2023 was $558,800. Like its review for substantial evidence, the Court's review for an abuse of discretion sets a highly deferential standard. "An abuse of discretion may occur if the Indiana Board's decision is clearly against the logic and effect of the facts and circumstances before it, or if the Indiana Board misinterprets the law." *Hubler*, 938 N.E.2d at 315 n.5.

While the certified record contains several pieces of evidence which the Donovans believe support their argument, there are substantial differences between those units and the subject property which the Donovans do not reconcile. The record shows that units in The Harbours vary significantly in floor level, views, bedroom and bathroom counts, condition, and upgrade quality. (*See* Cert. Admin. R. at 39–65, 134–

13

38.) While the Donovans estimated costs for some upgrades when comparing properties, they did not establish how those costs translated into value differences. (*See, e.g.*, Cert. Admin. R. at 130.) Ms. Donovan confirmed this in her testimony to the Board, agreeing when cross-examined that she did not adjust any of the properties she offered as comparables for differences such as condition, location in the complex, number of bedrooms, number of bathrooms, and condition or quality of the amenities. (*See* Cert. Admin. R. at 134–35, 138.) More fundamentally, the Donovans did not establish that they selected sales of comparable units when accounting for all value-affecting characteristics.

Rather than showing that the Board's conclusion is against the logic and effect of the facts and circumstances before it, the evidence in the record supports the Board's finding that the Donovans' evidence is unreliable. And while the Donovans demonstrate in their briefing that they are familiar with the concept of generally accepted appraisal principles, as the Board found, no evidence in the record shows that the Donovans used these principles to explain their valuation method or analyze their data to support their proposed valuation. Taken together, the evidence does not compel a result different than the Board's, and the Court will not disturb the Board's determination on this basis.

## IV.     The Donovans failed to show entitlement to an equalization adjustment

The Donovans contend that the assessment of their condo is unconstitutional and requires an equalization adjustment because it is abnormally high when compared to the average assessment of other properties in their complex. The Board found that the Donovans failed to complete a ratio study or compute an assessment-to-price ratio, which left the Donovans unable to demonstrate an entitlement to an equalization

14

adjustment of the subject property's assessment. After reviewing the evidence, the Court finds ample support for the Board's finding against an equalization adjustment and is not persuaded by the Donovans' ratio-study-type analysis that a constitutional violation exists in this case.

An equalization adjustment provides a method to bring assessments into compliance with Article 10, Section 1 of the Indiana Constitution. *BP Prods. N. Am. Inc. v. Matonovich*, 842 N.E.2d 901, 904 n.4 (Ind. Tax Ct. 2006). That provision of the Constitution states, in part, that "[t]he General Assembly shall provide, by law, for a uniform and equal rate of property assessment and taxation." IND. CONST. art. 10, § 1. This requires a "uniform, equal, and just system" of assessment and taxation in Indiana, where "each taxpayer's property wealth bear[s] its proportion of the overall property tax burden." *State Bd. of Tax Comm'rs v. Town of St. John*, 702 N.E.2d 1034, 1039–1040 (Ind. 1998) (internal citation omitted); *accord Boehm v. Town of St. John*, 675 N.E.2d 318, 327 (Ind. 1996). For the Donovans to prevail on such a claim, they must demonstrate that their property was "assessed and taxed on a different basis as compared to taxpayers with substantially similar property." *Indianapolis Hist. Partners v. State Bd. of Tax Comm'rs*, 694 N.E.2d 1224, 1229 (Ind. Tax Ct. 1998).

This Court has previously explained that one way to measure uniformity and equality in property assessment is through a ratio study. *Westfield Golf Practice Ctr., LLC v. Washington Twp. Assessor*, 859 N.E.2d 396, 399 n.3 (Ind. Tax Ct. 2007). A ratio study analyzes sales data to examine the relationship between an assessed value of a property and its market value-in-use. 50 IND. ADMIN. CODE 27-2-10. This can demonstrate a lack of uniformity and equality by "compar[ing] the assessed values of

properties within an assessing jurisdiction with objectively verifiable data." *Thorsness v. Porter Cnty. Assessor*, 3 N.E.3d 49, 51 (Ind. Tax Ct. 2014). To do so accurately, a ratio study "must be based on data that has been both appropriately stratified and statistically analyzed" with "all the properties . . . divided (i.e., stratified) into two or more subpopulations" before "a statistical measure of assessment uniformity [is] calculated." *Id*. at 53–54. The coefficient of dispersion, which "indicates the average deviation from the median sale/assessment ratio," is the most widely accepted statistical measure of tax assessment uniformity. *Id*. at 54.

As the Board found in its determination, the Donovans "offered a significant amount of raw sales and assessment data" but failed to use the data to develop a ratio study or compute an assessment-to-sales price ratio.[6] (Cert. Admin R. at 111 ¶ 33; *see* Cert. Admin. R. at 104–5 ¶ 14.) The Assessor's expert witness testimony confirmed that the Donovans' calculations differed from those in a traditional ratio study. (*See* Cert. Admin. R. at 145:18–146:4.) Instead of calculating a coefficient of dispersion, or another established measure of uniformity, the Donovans testified that they compared similar-sized condos in their complex and calculated an average assessment, which they then compared to their own assessment. (*See* Cert. Admin. R. at 52, 139–40.) The Donovans also compared these assessments based on an assessment-to-area ratio. (*See* Cert. Admin. R. 39, 50.) These comparisons were made without any adjustments

---

[6] Throughout the certified record, the Donovans conflate the term "ratio study" with the data used for such a study, referred to by the Donovans as a "ratio file." (*E.g.*, Cert. Admin. R. at 34, 114, 133–34.) A ratio study is a form of applied statistics used to draw conclusions about a group of properties sold during a given timeframe. INT'L ASSOCIATION OF ASSESSING OFFICERS, *Standard on Ratio Studies* 8 (2013), *available at* https://www.iaao.org/wp-content/uploads/Standard_on_Ratio_Studies.pdf. While a ratio study can only be as accurate as its data, that data must be analyzed and used in calculations to derive meaningful conclusions about valuation levels or uniformity. *See id*. at 11, 13–14.

16

to the previous sales. (*See* Cert. Admin. R. at 138:23–24, 140:20–23, 143:29–30, 144:14–16, 147:22.)

Indiana law does not require taxpayers to present ratio studies or present their findings in a particular format to demonstrate a constitutional infirmity in their assessment. *See Westfield Golf*, 859 N.E.2d at 399 n.3. But when the Donovans "present[ed] evidence to the Indiana Board, it [wa]s their duty to walk the Indiana Board through every element of their analysis." *Blesich v. Lake Cnty. Assessor*, 46 N.E.3d 14, 17 (Ind. Tax Ct. 2015) (emphasis omitted).

In this case, the Donovans relied on data from a previous ratio study and applied basic statistical analysis to that data. If the Donovans were attempting to complete a ratio study, the Board correctly determined that they failed to conform with professionally accepted standards for such a study. If instead the Donovans were attempting to use another method to demonstrate a lack of uniformity and equality, then the Board correctly determined that the Donovans' evidence was insufficient because it lacked the rigor and thoroughness necessary to demonstrate the validity of their alternative method for showing a lack of uniformity and equality. The Donovans failed to explain how comparing the average assessments of condos with square footage similar to their own demonstrated a nonuniform or unequal assessment. They never explained how such measures related to the market value-in-use of the analyzed properties.

While the Donovans used techniques that may be somewhat similar to valuation statistics used in ratio studies, they did not demonstrate that these alternative methods produce accurate results for comparing uniformity. Furthermore, while the Donovans may have presented some probative evidence of their property's value, the Board's

17

findings against the Donovans are supported by substantial and reliable evidence in the certified record and did not violate the law. The Donovans failed to sufficiently analyze their data or explain their methodology in such a way as to prove a lack of uniformity and equality in their assessment. Because the Board's findings in this case were not shown to be illegal, unsupported by evidence, or unconstitutional, the Court will not disturb the Board's resulting determination.

## V.    Warning regarding the use of artificial intelligence

In their briefing, the Donovans cited "*Rawles v. Monroe Cnty. Ass'r*, 48T10-1705-TA-00014, slip op. at 5–6 (Ind. Tax Ct. May 13, 2019)"—a case which neither the Court nor the Donovans were able to locate, because it does not exist. (Pet'rs' Reply at 10; *see generally* Pet'rs' October 6, 2025 Memo.) Ms. Donovan confirmed at the hearing that she had relied on artificial intelligence to aid in drafting her briefs, leading the Court to believe that this citation was an AI hallucination. (Oral Arg. at 24:24–25:15.) The Donovans also appear to quote this Court's *Piotrowski, O'Donnell,* and *Westfield Golf* cases in their reply brief, but the quoted language is not present in any of these Indiana Tax Court cases. *Compare Piotrowski v. Shelby Cnty. Ass'r*, 144 N.E.3d 887, 892 (Ind. Tax Ct. 2020), *and O'Donnell v. Department of Local Government Finance*, 854 N.E.2d 90 (Ind. Tax Ct. 2006), *and Westfield Golf Practice Ctr., LLC*, 859 N.E.2d 396, *with* (Pet'rs' Reply at 5, 9–10).

Courts have sanctioned both attorneys and *pro se* litigants for citing fictitious cases in briefs. *Williams v. Kirch*, 268 N.E.3d 284, 288 (Ind. Ct. App. 2025); *see also In re Baby Boy*, --- N.E.3d ----, ----, 2025 WL 2046315, at *23 (Ill. App. Ct. July 21, 2025) (requiring an attorney who cited fictious cases in his briefs to pay monetary sanctions

18

and sending a copy of the opinion to the Illinois Attorney Registration and Disciplinary Commission). False citations may also have negative effects on the outcome of a case. *See, e.g.*, *Kruse v. Karlen*, 692 S.W.3d 43, 52–53 (Mo. Ct. App. 2024) (determining that the appellant's use of fictitious citations in his brief mandated a dismissal of the appeal), *reh'g denied*, *trans. denied.* Citing fictious cases adversely affects all parties in a case. *See Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 448 (S.D.N.Y. 2023). It "wastes time and money in exposing the deception" and takes a court's time "from other important endeavors." *Id.* Moreover, "client[s] may be deprived of arguments based on authentic judicial precedents." *Id*.

The Court admonishes the Donovans for failing to confirm the accuracy of their legal presentations but will impose no further penalties. Particularly when using generative AI, attorneys and *pro se* litigants alike have a duty to independently verify the authenticity of authoritative sources cited to the Court and to ensure they are used accurately. Judges must be able to rely on the authenticity of the authorities cited by the parties to make just decisions. *Williams*, 268 N.E.3d at 288.

## CONCLUSION

The Board's final determination in this matter is AFFIRMED.