PETITIONER APPEARING PRO SE:
**ANDY YOUNG**
Wadsworth, IL

ATTORNEY FOR INTERVENOR:
**ROBERT B. GOLDING JR.**
AMBER, GOLDING & HOFSTETTER
Dyer, IN

ATTORNEY FOR RESPONDENT:
**THEODORE E. ROKITA**
ATTORNEY GENERAL OF INDIANA
**LYDIA A. GOLTEN**
DEPUTY ATTORNEY GENERAL
Indianapolis, IN

# IN THE
# INDIANA TAX COURT

FILED

Jun 12 2026, 12:36 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ANDY YOUNG, )
)
Petitioner, )
)
and )
)
DEBORAH FOSTER, )
)
Intervenor, ) Case No. 25T-TA-00006
)
v. )
)
INDIANA DEPARTMENT OF LOCAL )
GOVERNMENT FINANCE, )
)
Respondent. )

ON APPEAL FROM A FINAL DETERMINATION OF
THE INDIANA DEPARTMENT OF LOCAL GOVERNMENT FINANCE

**FOR PUBLICATION**
**June 12, 2026**

MCADAM, J.

Indiana law allows taxpayers to challenge property tax valuations from multiple angles. A property owner is free, of course, to appeal a tax assessment on their specific parcel for a specific tax year. But there is another option, broader in its scope and

prospective in its application. By statute, a taxpayer may petition the Department of Local Government Finance ("DLGF") to review the schedule of land values (known as a "land order") adopted by the county assessor that are used as part of the property assessment process. This latter approach was used by Young to challenge the land order adopted by the Lake County Assessor in 2023. However, Young, along with several members of the community, was unable to convince the DLGF that these base rates should be modified or rejected. Now, on appeal with this Court, Young and the Intervenor Foster raise a litany of issues to suggest that the DLGF's review was insufficient. The Court does not agree, finding insufficient evidence in the record to overturn the DLGF's final determination.

## FACTS AND PROCEDURAL HISTORY

As noted in the introduction, this case is about a county land order. By statute, every county assessor is required to "determine the values of all classes of commercial, industrial, and residential land . . . in the county using guidelines determined by the department of local government finance." IND. CODE § 6-1.1-4-13.6(a) (2025). A land order is the colloquial term for a document that contains those land values. *See Young v. Dep't of Loc. Gov't Fin.*, 237 N.E.3d 1175, 1176 n.1 (Ind. Tax Ct. 2024), *transfer denied*, 255 N.E.3d 438 (Ind. 2025) (*Young I*). To determine the land values, the Assessor categorizes all property in a county into different neighborhoods (each of which is assigned a class based on majority use) and then selects representative sales disclosures or valuations that fairly represent the value of property in each neighborhood. *See* REAL PROPERTY ASSESSMENT GUIDELINES FOR 2021, Ch. 2 at 6–8 [hereinafter "GUIDELINES"] (incorporated by reference at 50 IND. ADMIN. CODE 2.4-1-2(c)

2

(2025)). By listing land values in the land order on a per-unit basis (e.g., per square foot, per front foot, etc.), the assessor effectively sets a "base rate" for a "base lot" in each neighborhood. *Id*. at 8 (noting that the base rate is the value of the "base lot" and "represent[s] the typical and average characteristics of lots in the neighborhood for the purpose of making pricing adjustments"). To determine the value of a specific parcel of land as part of an assessment, an assessor adjusts the base rate for that neighborhood with an influence factor, which "represents the composite effect that influences the value of certain lots within the boundaries of an entire neighborhood." *Id.* at 43. This land value is then combined with the values of a property's improvements and other rights that add or remove value to reach an assessment of the real property in question. GUIDELINES, Ch. 1 at 2 (explaining what is included in the reassessment of real property).

By statute, a person may file a petition to have the DLGF review the land values determined in a land order. IND. CODE § 6-1.1-4-13.6(d). The petition must be filed not later than forty-five days after the land values are determined and must be signed by 100 property owners or 5% of the property owners in the county, whichever is fewer. *Id.* Once a valid petition is filed, the DLGF is required to "review the land values determined by the county assessor" and hold a public hearing. IND. CODE § 6-1.1-4-13.6(f). The DLGF must then approve, modify, or disapprove the land values. *Id.*

In this case, the Lake County Assessor developed a new land order in 2023 and presented it to the Lake County Property Tax Assessment Board of Appeals ("PTABOA") at a public meeting in June of 2023. The 2023 land order was created using sales data from 2021 and 2022 and replaced the land order developed in 2022.

Young challenged the Lake County Assessor's 2023 land order using the petition process outlined in statute. He submitted a petition for review to the DLGF that included signatures from 170 affected property owners. After the petition was received, the DLGF notified the township and county assessors in Lake County and requested a copy of the land order, sales data used to create the land order, and information about the delineation of neighborhoods. In response to these requests, the assessors provided more than 2,800 pages of information on the 2023 Lake County land order, including the entire order itself, neighborhood counts, sales data, parcel lists, emails, and PTABOA meeting minutes.

The DLGF scheduled a public hearing for October 10, 2023, and sent notice of that hearing, by mail, to each petition signatory approximately forty days before the hearing. In its notice, the DLGF included a hearing agenda, guidance for providing information, and instructions for registering to speak. The DLGF posted the hearing notice and exhibits on its website approximately one month before the hearing. Notice of the hearing was also posted outside of the Lake County Assessor's office and outside the DLGF hearing room in Indianapolis.

At the hearing, the DLGF received public comments from several property owners expressing concern about the 2023 land order, particularly from residents of the Miller Beach area in Calumet Township. These comments were not given under oath, and each speaker was limited to five minutes. The DLGF also received written comments from over 200 taxpayers both before and after the hearing.

The DLGF also conducted two separate reviews of the data the Lake County Assessor used to create the 2023 land order. The reviews were completed by DLGF

field representatives at the request of the DLGF's Director of Assessment. They analyzed underlying sales data from 2021 and 2022, reviewed ratio studies for each township, and performed focused analysis of Calumet Township and the Miller Beach area.[1]

The DLGF issued its final determination on February 28, 2025 and ordered no change to the 2023 land order. In its determination, the DLGF noted that it reviewed the public comments, statistical tools used to create the land order, and the reports created by DLGF employees analyzing the land order sales data. The DLGF also explained that special attention was paid to the Miller Beach neighborhood, and Calumet Township more generally, because the taxpayers who expressed concerns about the land order were from those areas. When the ratio studies for these areas were reviewed, the DLGF found all data to be in the proper range and in compliance with assessment and appraisal standards. Ultimately, the DLGF concluded that (1) the 2023 land order was properly prepared, (2) the base rates were determined using correct methodologies and sufficient data, and (3) taxpayers submitted no probative evidence warranting modification or disapproval. (Cert. Admin. R. at 4051, 4054.)

Young then appealed the DLGF's determination to this Court. Foster later moved to intervene in the appeal, which the Court granted after neither party opposed her request.

---

[1] A ratio study compares the assessed values of properties within a jurisdiction by using objective, verifiable data, such as sales prices or appraisals. *Thorsness v. Porter Cnty. Assessor*, 3 N.E.3d 49, 51 (Ind. Tax Ct. 2014).

**STANDARD OF REVIEW**

The party challenging the DLGF's final determination bears the burden of demonstrating its invalidity. *City of Greenfield v. Indiana Dep't of Loc. Gov't Fin.*, 22 N.E.3d 887, 891 (Ind. Tax Ct. 2014). This Court reviews "the propriety of 1) the DLGF's factual findings and 2) the DLGF's legal conclusions in light of those factual findings." *Indianapolis Pub. Transp. Corp. v. Indiana Dep't of Loc. Gov't Fin.*, 988 N.E.2d 1274, 1277 (Ind. Tax Ct. 2013) (citing *State Bd. of Tax Comm'rs v. Gatling Gun Club, Inc.*, 420 N.E.2d 1324, 1326–29 (Ind. Ct. App. 1981)). Accordingly, a petitioner must demonstrate that the final determination is arbitrary and capricious, an abuse of discretion, contrary to law, or unsupported by substantial evidence. *City of Carmel v. Indiana Dep't of Loc. Gov't Fin.,* 246 N.E.3d 832, 834 (Ind. Tax Ct. 2024), *review denied sub nom. City of Carmel v. Dep't of Loc. Gov't Fin.*, 259 N.E.3d 998 (Ind. 2025). The Court neither reweighs the evidence nor judges the credibility of witnesses in its review. *Brown v. Dep't of Loc. Gov't Fin.*, 989 N.E.2d 386, 390 (Ind. Tax Ct. 2013).

**DISCUSSION**

The Petitioner and Intervenor each raise multiple challenges to the DLGF's determination affirming the Lake County land order for 2023. While both believe that the DLGF failed to adequately review the land order, their arguments differ substantially and merit separate discussion. Therefore, to ensure the Court is both thorough and efficient in its examination of every argument presented, the claims of Young and Foster will be discussed separately.

**I.     Young's Claims**

Young raises numerous claims in this appeal, many of which overlap or are not clearly delineated. Although Young bears the burden of demonstrating prejudicial error by the DLGF in this case, the Court has categorized his claims to ensure thorough analysis.

*A.     Timing of the 2023 Land Order*

Young asserts two claims of error related to the timing of the 2023 land order. First, Young claims that the land order was submitted too late to apply to the 2023 assessment year. He contends that, because the Assessor did not present the 2023 land order to the PTABOA until June 21, 2023—after the January 1, 2023 assessment date under Indiana Code § 6-1.1-2-1.5(a)(2)—the land values contained therein could not lawfully be applied to 2023 payable 2024 tax bills.[2] (Pet'r Br. at 5, 8–9, 13–14.) Second, Young argues that the 2023 land order impermissibly overlaps with the 2022 land order, which this Court addressed in a previous case, *Young I*, involving the same petitioner. (Pet'r Br. at 5, 15.) Young believes that *Young I* established a requirement that the 2022 land order be applied to the 2023 tax year. *See id.* The Court disagrees with Young on both claims.

Regarding Young's claim that the 2023 land order was submitted too late, Young conflates the annual assessment date for valuing tangible property under Indiana Code § 6-1.1-2-1.5 with the process for the preparation and submission of land orders. The deadline for preparing and submitting land orders is established by a county's

---

[2] For clarity, property taxes are often referenced by both assessment and payment years because, absent an exception, property taxes "assessed for [one] year . . . are due . . . the following year." IND. CODE § 6-1.1-22-9(a).

7

reassessment plan. Indiana Code § 6-1.1-4-13.6(a) expressly requires an assessor to submit a land order to the PTABOA and DLGF "by the dates specified in the county's reassessment plan." Whereas the annual assessment date is the point in time at which the value of property is determined for purposes of property taxation. *See* IND. CODE § 6-1.1-1-2 (defining the "assessment date" as "the date on which tangible property is assessed and valued for purposes of collecting ad valorem property taxes imposed for that date"); IND. CODE § 6-1.1-2-1.5.

The annual assessment date is not a deadline by which assessors must complete land orders. This Court previously rejected this argument that a land order submitted to the PTABOA after the January 1 assessment date was untimely in *Camelot Co., LLC v. Bartholomew Cnty. Assessor*, 224 N.E.3d 1007, 1014 (Ind. Tax Ct. 2023). There, the Court explained that Indiana law does not prohibit an assessor from using valuation data submitted to the PTABOA after the assessment date:

> [W]hile Indiana's annual assessment date is January 1 . . . that does not mean that assessments are actually completed and finalized on that date. For example, when formulating land values to be used in a given assessment year, assessing officials are to analyze and rely on data from sales transactions that have occurred through and including December 31 of the previous . . . calendar year . . . . [I]t is not possible for assessing officials to analyze all applicable sales data, determine land values, submit them to the [PTABOA], reassess overall assessment valuations using those land values, update corresponding record cards, and provide notice to taxpayers of changes to assessments between December 31 and January 2. Accordingly, . . . the process by which land values and land orders are determined and applied must be very fluid and flexible. Indiana's Assessment Manual provides that flexibility by specifying that property assessments are to reflect a valuation "as of" the January 1st date.

*Id.* at 1015 n.5 (internal quotation marks, citations, and emphasis omitted); *see also Marion Cnty. Assessor v. Simon DeBartolo Grp., LP*, 52 N.E.3d 65, 69–70 (Ind. Tax Ct.

8

2016) (recognizing that evidence of value from dates after an assessment date may be used to value a property if there is "[an] attempt to relate that evidence to the appropriate valuation and assessment dates").

In this case, there is no evidence that the 2023 land order was not adopted by the deadline established in Lake County's reassessment plan. The 2023 land order was completed within the first year of the reassessment cycle, and its base rates appear to apply prospectively from the time of its submission. (Cert. Admin. R. at 3311–3312, 3932 (showing the 2023 land order was submitted to PTABOA on July 12, 2023).) As in *Camelot*, no Indiana law prohibited the Lake County Assessor from submitting the 2023 land order when she did.

As to the purported overlap with the 2022 land order that Young raises in his second claim, Young misreads this Court's decision in *Young I*. Young points to this Court's observation that:

> [B]ase rates in [the 2022 land order] will be applied to taxes due in 2023 and subsequent years until the year after the next determination of land values is adopted. The next land values determination must be adopted no later than 2026, though it may be prepared at any time within the reassessment cycle.

*Young I*, 237 N.E.3d at 1178. According to Young, the Court's statement that the 2022 land order "will be applied to taxes due in 2023" is binding and precludes the Assessor from adopting a new land order for that year. But Young reads too much into the Court's attempt to contextualize its holding. The Court went on to explain that a new land values determination "may be prepared at any time within the reassessment cycle." *Id*. *Young I* simply clarified the relationship between the four-year reassessment cycle and the timing of land orders, explaining that "[t]he four-year period is not the time during which

9

a particular determination of land values applies. Rather, it is the period during which at least one land values determination must be adopted." *Id*. at 1177.

As *Young I* explains, Indiana Code § 6-1.1-4-4.2, which establishes requirements for county reassessment plans, does not explicitly prohibit a county assessor from issuing a new land order within the same reassessment cycle; instead, the statute only requires that "each group of parcels shall be reassessed under the county's reassessment plan once during each four (4) year cycle." IND. CODE § 6-1.1-4-4.2. The statute does not bar additional reassessments during the four-year cycle. Young's interpretation would require this Court to prohibit additional reassessments by reading additional words into the statute, such as "only once" or "not more than once." The Court will not add words to the statute that are not there. *Marion Cnty. Assessor v. Square 74 Assocs., LLC*, 228 N.E.3d 542, 549 (Ind. Tax Ct. 2024) (citing *Kitchell v. Franklin*, 997 N.E.2d 1020, 1026 (Ind. 2013)).[3]

Accordingly, the DLGF did not err in concluding that the 2023 land order was timely.[4]

---

[3] Although the DLGF does not make a formal finding in its final determination, it appears that the 2022 and 2023 land orders in this case may have been issued during different assessment cycles. (Cert. Admin. R. at 3932.) If true, this fact would render any potential conflict with Indiana Code § 6-1.1-4-4.2 moot.

[4] It is not obvious whether the DLGF may review the components of the land order plan creation process; Indiana Code § 6-1.1-4-13.6 only explicitly authorizes the DLGF to (1) review the land values and (2) approve, modify, or disapprove those values. Questions regarding the frequency of land reassessments in a land order plan, the effective date of a land order, or the propriety of adopting of multiple land orders within a 4-year cycle may require review through a different mechanism or may even be properly reviewed by a different entity, such as the Indiana Board of Tax Review. However, such questions will be left for another day, as they are neither raised by the parties nor necessary to resolve this appeal.

## B. Sufficiency of Sales Data

Young contends that the 2023 land order was based on insufficient sales data, pointing to notes in the portion of the land order regarding Calumet Township which he claims indicate that many neighborhoods had no vacant land sales or that the only available sales were tax sales. (Pet'r Br. at 6, 10, 16–17; Cert. Admin. R. at 847–862.) Young argues that the near total absence of normal market sales of vacant land indicates a "moribund market" and that large base rate increases over the prior year were unjustified. (Pet'r Br. at 17.) The Court finds that Young has failed to demonstrate that the available market data was insufficient to support the values in the land order. The DLGF's regulations expressly contemplate alternative methods for valuing land when sales are limited.

The DLGF's administrative rule, 50 Indiana Administrative Code 27-5-7, provides that "[t]he sales comparison approach is the primary approach to land valuation and is always preferred when sufficient sales are available." 50 IND. ADMIN. CODE 27-5-7(b) (2025). However, when fewer than five sales exist in a given stratum, the rule authorizes several alternative methods, including using land values from a similar neighborhood, extracting land value from valid sales of improved properties, or expanding the time period from which sales are drawn. *Id*. at (b)(1)–(3).

The record reflects that the DLGF's field representatives carefully analyzed the sales data underlying the 2023 land order and found sufficient sales of improved properties to extract a land value as permitted by the DLGF's regulations. (Cert. Admin. R. at 4058–4061.) For Calumet Township, the DLGF found 1,337 valid sales for residentially improved property. The ratio study statistics showed that the median

11

assessment ratio, coefficient of dispersion, and price-related differential were within the standard of the International Association of Assessing Officers ("IAAO").[5] The DLGF further analyzed individual Miller Beach neighborhoods and confirmed that each met the applicable statistical parameters.

Young does not identify legal, mathematical, or other authoritative support to establish a minimum threshold of sales data beyond that expressed in 50 Indiana Administrative Code 27-5-7. Likewise, while Young believes that the sales data was misinterpreted and led to base rate changes that are "mathematically impossible," he provides no support for these claims. He does not provide a competing analysis of the data or point to any authority to support his claims that the methodology employed by the DLGF and Assessor was improper. Without legal support, Young's assertions are conclusory and cannot be used by this Court to overturn the DLGF's determination. *See, e.g., Marinov v. Tippecanoe Cnty. Assessor*, 119 N.E.3d 1152, 1156 (Ind. Tax Ct. 2019) (noting generalized statements without supporting evidence are merely conclusory and are not sufficient to overturn an assessment). Because Young failed to show that the DLGF's examination of the sales data was inadequate, the Court will not disturb the DLGF's final determination on this ground.

C.      *Valuation Methodology*

Young challenges the Assessor's use of the abstraction and allocation methods to determine land values, arguing that the Assessor over-relied on these methods and

---

[5] The IAAO is an educational and research association of individuals working with property taxation and assessments. *See Meridian Towers E. & W. v. Washington Twp. Assessor*, 805 N.E.2d 475, 480 n. 8 (Ind. Tax Ct. 2003). IAAO standards are expressly permitted by law for use by county assessors and the DLGF in adjustments and equalizations. 50 IAC 27-1-4.

that they yielded arbitrary results.[6] (Pet'r Br. at 6, 17–18.) Young also argues that the Assessor should have relied more heavily on tax sales when analyzing sales data. (Id. at 18.) This criticism of the Assessor's methodology, however, is not accompanied by legal or factual support to show the Court that an error has occurred. Without such support, Young's claims cannot demonstrate the errors he alleges. As such, the Court declines the invitation to overturn the DLGF's determination on this basis.

The abstraction and allocation methods for valuing residential land are authorized by Indiana law. The DLGF's Real Property Assessment Guidelines explain that "[w]hen establishing land values throughout the jurisdiction, each assessing official *shall* evaluate sales information by using the sales comparison method, the abstraction method, or the allocation method." GUIDELINES, Ch. 2 at 12 (emphasis added). The abstraction method estimates land value by subtracting the depreciated value of improvements from the sales price. *Id*. The allocation method estimates land value by analyzing the percentage contribution of land to the total sale. *Id.* at 13. Both methods value land by obtaining sales data for improved properties and deriving a land value by removing the value of improvements—a practice which is explicitly authorized by Indiana law when unimproved sales are insufficient. *See* 50 IND. ADMIN. CODE 27-5-7(b)(2) (permitting assessors to "[e]xtract the land value from valid sales of improved properties" when there are insufficient sales available in a stratum).

The Assessor's application of the abstraction and allocation methods was reviewed by the DLGF when it had two different experts review the content of the

---

[6] Young occasionally refers to the "extraction method" and the use of a "15–20% land to value" ratio. (*See, e.g.*, Pet'r Br. at 17.) The Court understands him to mean the abstraction method and a land-to-improvement ratio.

submitted ratio studies used to determine the land values; both found that the methods complied with all IAAO requirements. (*See* Cert. Admin. R. at 3934–35, 3938–40.) Without any analysis showing how or why the Assessor's calculations or methodology were flawed, the Court is left with a bare supposition, which cannot meet Young's burden on appeal.

Young's other contention that tax sales should have played a larger role in the creation of the land order is wholly unsupported. Tax sales occur when property is sold to satisfy tax debt and are not necessarily reflective of a property's market value-in-use. *See Robey v. Fairfield Twp. Assessor*, No. 49T10-0708-TA-42, 2009 WL 4668740, at *5 (Ind. Tax Ct. Dec. 9, 2009); *cf.* INTERNATIONAL ASSOCIATION OF ASSESSING OFFICERS, STANDARD ON RATIO STUDIES at 49 (Apr. 2013) (noting that forced sales are generally invalid for ratio studies without evidence that the sale was an open market transaction), https://www.iaao.org/wp-content/uploads/Standard_on_Ratio_Studies.pdf. Nonetheless, Young asserts that the high frequency of tax sales demonstrates a downward trend in the area's real estate market. While this may very well be true, Young fails to support his claim with data, calculations, legal citations, or expert testimony. Beyond his unsupported claim, there is no authority provided for the proposition that assessors should incorporate tax sale data into their land order analysis. As this Court held in *Robey*, use of a tax sale to value a property requires a demonstration "that the bid price is probative [of] the property's market value-in-use." *Robey*, No. 49T10-0708-TA-42, at *5. Young has therefore failed to demonstrate a reason to overturn the DLGF's determination on this basis.

### D. Pricing Methods

Young takes issue with the Assessor's decision to use the per-square-foot ("PSF") method rather than the per-front-foot ("PFF") method to value residential land in the Miller area. (Pet'r Br. at 19–20.) He asserts that the Lake County and Calumet Township assessors have been using the PSF method to assess residential land in Lake County. (Id. at 20.) He argues that, because the 2023 land order did not include PSF pricing for residential vacant land in Miller, the entire land order should be "set aside" and that any assessments of residential land utilizing the PSF method should be deemed invalid because they are not in compliance with the 2023 land order. (Id.) The Court finds that the lack of such a pricing method does not undermine the land order or require a remand.

First, to the extent that Young is challenging the application of the land values in the 2023 land order to the assessments of specific properties, such a claim is outside the scope of the review contemplated by Indiana Code § 6-1.1-4-13.6(e). The DLGF's review of the 2023 land order concerned the base rates applicable to classes of land across the county, not the application of those rates to individual parcels. *See* IND. CODE § 6-1.1-4-13.6(a) (when creating a land order, "[t]he county assessor shall determine the values of all classes of . . . residential land . . . [and] submit the values and any supporting document to the county"). The sole power granted to the DLGF by the statute is to "review the land values determined by the county assessor" and "approve", "modify", or "disapprove" those values. *See* IND. CODE § 6-1.1-4-13.6(f). Whether a particular land value determined in a land order is properly applied to a particular parcel is beyond the scope of the DLGF's power under section 6-1.1-4-13.6. Such claims are a

15

different matter with a different process, appropriately channeled through the property tax appeal process. *See* IND. CODE § 6-1.1-15-1.1, -1.2 (identifying the available claims, applicable deadlines, and initial review processes for appealing assessments of tangible property owned by individual taxpayers.)

Second, to the extent Young is correct that the 2023 land order did not include PSF pricing for residential land, the DLGF's assessment rules give assessors wide latitude to decide which particular pricing method to use and note that many different pricing methods are valid. The Real Property Assessment Guidelines describe five types of unit values for land valuation: front foot value, square foot value, acreage value, site value, and unit density. GUIDELINES, Ch. 2 at 13–15. The Guidelines specifically note that "[i]t should be stressed that the pricing method for valuing the neighborhood is of less importance than arriving at the correct value of the land as of the valuation date." *Id.* at 14. The Guidelines also provide that the assessing official determines which unit value is appropriate and advise that the determination of which pricing method is appropriate turns on several factors. *Id*. at 13-14 (listing the following factors: "size, dimensional data available on tax maps or plat maps, methods of comparison used by the typical buyer and seller, and the ease of application"). Here, the DLGF, in its review, determined that the methods used by the Assessor were correctly applied and Young has not provided any authority to support his claim that they were not.

### E.     Statutory Notice Requirements for the DLGF's Hearing

Young argues that the DLGF's notice of the public hearing was inadequate and did not comply with Indiana Code § 5-3-1-2. (Pet'r Br. at 7, 27.) Young contends that public notice of the DLGF's hearing and the Assessor's land order should have been

included in the local newspapers. The Court concludes that no such requirement exists and that the notice provided by the DLGF was sufficient.

Young fails to demonstrate that the DLGF's hearing was subject to Indiana Code § 5-3-1-2. Subsection a of Indiana Code § 5-3-1-2 limits the application of the statute's notice requirement to situations "when notice of an event is required to be given by publication in accordance with this chapter." IND. CODE § 5-3-1-2(a). Young has not provided any analysis or pointed to any authority linking section 5-3-1-2 to the DLGF's review under section 6-1.1-4-13.6; the Court will not endeavor to do so on its own. It is the litigant's responsibility to walk the Court through its argument and explain its contention. *Ciceu v. Knox Cnty. Assessor*, 272 N.E.3d 583, 589 n.4 (Ind. Tax Ct. 2025).

The applicable law in this instance, as was the case in *Young I*, does not impose a statutory notice requirement on the DLGF beyond the obligation to hold a public hearing. IND. CODE § 6-1.1-4-13.6.[7] "The Indiana General Assembly has provided specific public hearing notice requirements in multiple places throughout Indiana Code's Article 6-1.1, and here it has not done so." *Young I*, 237 N.E.3d at 1181. As this Court said in *Young I*, "the Court will not create its own specific notice requirement. That is a matter for the legislature." *Id*.

Even so, like the facts in *Young I*, the record here demonstrates that the DLGF made reasonable efforts to provide public notice. The DLGF scheduled the hearing for the evening after traditional working hours and allotted each taxpayer who requested to

---

[7] The legislature recently amended Section 13.6 to add a requirement that "notice of the hearing shall be given by the [DLGF] to the assessor and to the first ten (10) petitioners at least five (5) days before the date of the hearing." IND. CODE § 6-1.1-4-13.6 (2026); *see* Pub. L. No. 230-2025, § 20, 2025 Ind. Acts 3719. This provision did not exist when the DLGF held its hearing and so does not apply in this case, though the Board's actions far exceed the new statutory requirement for notice.

speak up to five minutes of time to testify. The DLGF mailed individual letters to all 171 petition signatories that included "a hearing agenda, guidance for providing evidence, and instructions for registering to speak at the hearing" along with a "virtual computer link address for members of the public to electronically attend the hearing" and a phone number for taxpayers to participate by telephone. (Cert. Admin. R. at 4051.) The DLGF posted the hearing notice and exhibits on its website approximately one month before the hearing, and the Assessor posted notice outside her office. (Cert. Admin. R. at 3929–3930, 4051–4052.) The DLGF also accepted written submissions for two weeks after the hearing and responded to communications with over 250 individual taxpayers. Nothing further was required of the DLGF.

### F. DLGF Review of Individual Taxpayer Properties

Young objects to the DLGF's thorough review of properties he owns, asserting that DLGF staff spent "an inordinate amount of time" investigating his holdings and that this was irrelevant to the land order review. (Pet'r Br. at 23–25.) The record reflects that the DLGF reviewed properties belonging to Young and other petition signatories to cross-check its analysis of the 2023 land order. (Cert. Admin. R. at 4059.) Young does not explain how the DLGF's consideration of this information rendered the 2023 land order flawed or the final determination erroneous. If anything, the DLGF here exercised reasonable judgment, focusing its review efforts on the property owners who were likely affected the most, as such an effect would motivate action in those owners. The mere fact that the DLGF examined the petitioner's properties as part of its review does not establish that the review was biased or improper.

### G.    Assessment Errors

Young also points out two specific instances where he believes the DLGF failed to make proper adjustments to erroneous property valuations. He specifically references a property in Gary that sold for over $7 million in 2022 but was assessed at $7,400 and a property in Calumet township with a homesite valued at $411,000 an acre but residential excess acreage valued at $4,100,000. (Pet'r Br. at 25–26 n.19–20.) Young says that although these issues were brought to the DLGF's attention, the property value was not changed.

But, again, Young overstates the scope of the DLGF's review. A review of a land order looks for correct values of land categories, not the accuracy of individual property assessments. *See* IND. CODE § 6-1.1-4-13.6(e) (directing DLGF to "review the land values determined by the county assessor" and "approve", "modify", or "disapprove" them). Such individualized review is a different matter with a different process, appropriately channeled through the property tax appeal process. *See* IND. CODE § 6-1.1-15-1.1, -1.2 (identifying the available claims, applicable deadlines, and initial review processes for appealing assessments of tangible property owned by individual taxpayers.) As such, Young's claim is beyond the scope of the statutory review process underlying this appeal.

### H.    Other Assertions

Beyond the arguments outlined in detail above, Young also makes a multitude of assertions without support from legal or evidentiary citations. These assertions include that such high magnitude base rate increases are impossible, that the base rate for U.S. Steel's land demonstrates unequal treatment, that the Assessor misinterpreted sales

data, and that specific errors exist in land order entries or their applications to specific properties. (Pet'r Br. at 4–5, 9, 21–23, 25–26; Pet'r Suppl. Br. at 2–3, 6–7; Pet'r Suppl. Reply Br. at 2–4.) In some instances, the assertions are particularly severe, such as where Young alleges that the Lake County Assessor and the DLGF "perpetrated a fraud" and relied on "fraudulent data" for its studies. (Pet'r Br. at 4–5.) It is not always clear what remedy Young is requesting or believes to be appropriate.[8]

Pro se litigants are held to the same legal standards as licensed attorneys; they cannot avoid this Court's standard of review or plead ignorance of its requirements. *Ciceu*, 272 N.E.3d at 588. Among those standards is the requirement to explain the legal and factual basis of each claim and walk the court through the analysis. *Id*. at 589 n.4. Because Young has not done that here with any of these claims, the Court considers them waived and will not address them further. *Id*.

## II.    Foster's Claims

Foster intervened in this appeal, without objection from either party, raising four principal claims: (1) that the DLGF's determination of the base rate for her property in Neighborhood 2515 was not uniform and equal because her land was assessed on an acreage basis (amounting to $11.48 per square foot after conversion) while other platted lots in the same neighborhood were assessed at $2.98 per square foot; (2) that she had a constitutional right to actual notice of the DLGF's review proceedings; (3) that

---

[8] Young's Supplemental Brief suggests that the Court should order the DLGF to review all value increases over 100%. (Pet'r Suppl. Br. at 1 ("It would be a gross injustice to let the base rates that increased by 3 and 4-digit percentage[s] . . . stand").) Such a claim was untimely presented in the post-hearing supplemental briefing and could have been addressed in Young's initial brief. It was also unauthorized by the Court's limited order for supplemental briefing. The argument is therefore waived. *Davidson v. State*, 211 N.E.3d 914, 925 (Ind. 2023); *see* Ind. Appellate Rule 46(A).

she was not given notice of reassessment for the 2023 tax year as required by Indiana Code § 6-1.1-4-22; and (4) that her land was improperly assessed more than once during the four-year reassessment cycle.[9] (Interv'r Br. at 1–8.) The Court will address each in turn.

### A.   Discrepancy, Uniformity, and Fundamental Error

Foster's primary complaint is the discrepancy in treatment between her property and others in her neighborhood. She claims that her property's base rate was determined on an acreage basis, which converts to an effective rate of $11.48 per square foot, while the other platted lots in Neighborhood 2515 were determined on a front foot basis, resulting in an effective rate of $2.98 per square foot. (Id. at 2–4.) Foster believes that her property should be assessed on a square foot basis like other properties in the neighborhood and that this discrepancy demonstrates a fundamental error in the land order in violation of her right to a uniform and equal tax rate under the Indiana Constitution. (Interv'r Suppl. Br. at 5–6.) While Foster is consistent in her belief that the effective rate of $11.48 per square foot is incorrect, she is inconsistent in attempting to identify what error results in this incorrect rate. She initially claims that the use of the acreage basis is the fundamental error, claiming that property located in a neighborhood and zoned for single family residence must be valued on a square footage basis. After the hearing, however, Foster pivots to three different arguments. First, she argues that, as a "logical proposition," the rate of increase in the price per

---

[9] While the DLGF believes Foster should be prohibited from bringing claims at this stage in the appeals process, the DLGF had the opportunity to object when Foster sought to intervene but chose not to do so. Nonetheless, the failure of her substantive claims renders this issue moot.

acre category must match the rate of increase in the price per front foot category for her neighborhood. (Id. at 4 and n.2.) Second, she asserts "that land directly on Lake Michigan in neighborhood 2512 should increase [in value] at the same or at a greater rate than land not directly on Lake Michigan" in neighborhood 2515 (Foster's neighborhood). (Id. at 5.) Third, Foster contends that a fundamental error occurred because her land-to-improvement ratio was significantly higher than the typical value. (Id. at 5–6.)

Foster's primary argument, that her property should be assessed on a square footage basis like other properties in her neighborhood, requires an examination of her individual property, which is properly done through an appeal of her individual assessment instead of through an appeal of the DLGF's land order review. As has been said, whether a particular land value determined in a land order is properly applied to a particular parcel is beyond the scope of the DLGF's power under section 6-1.1-4-13.6(f). Whether the Assessor correctly classified Foster's property as a platted lot or acreage is a question about the parcel-level application of a land order that likely falls within the jurisdiction of the PTABOA and, on further appeal, the Indiana Board of Tax Review under Indiana Code § 6-1.1-15-1.1. *See, e.g., Muir Woods Section One Ass'n, Inc. v. O'Connor*, 172 N.E.3d 1205, 1207 (Ind. 2021) (reviewing the application of land order base rates to common areas owned by a homeowners association); *McDonald's Corp. v. Indiana State Bd. of Tax Comm'rs*, 747 N.E.2d 654, 658 (Ind. Tax Ct. 2001) (concluding that a taxpayer's land was not valued correctly pursuant to the effective land order).[10]

---

[10] Indeed, Foster stated at oral argument that she appealed her individual property tax assessment for the years at issue and resolved those matters favorably. (Tr. 70:24-70:21.)

Turning to Foster's supplemental arguments, Foster does not point to any authority aside from pure logic to support her assertions about land valuation. She does not support, with law or evidence, her contention that the rate of increase in the price per acre of land must match the rate of increase in the price per front foot of land for her neighborhood. She also does not support her contention that land directly on Lake Michigan in one neighborhood should increase at the same rate or greater than land not directly on Lake Michigan in her neighborhood. And she does not explain why her land-to-improvement ratio should match the average or typical value.[11]

Foster's arguments also make assumptions about comparative property values without examining whether variations in those base rate values are justified according to generally accepted appraisal practice or the DLGF assessment regulations. Generalizations about improper variation in land value on and near Lake Michigan or atypical land-to-improvement ratios are only relevant if the land being compared has the same classification and substantially similar characteristics. Such a comparison, however, would require analysis of many features such as the size and shape of tracts, zoning, development conditions, infrastructure components, geographic features, proximity to primary traffic routes, government services, and neighborhood desirability. *See* GUIDELINES, Ch. 2 at 8–9. Such differences in character may explain the differences

---

[11] Foster points to a note in the land order that she contends indicates that the acreage base rate should match the front foot rate. (Cert. Admin. R. at 475 (note stating: "homesite rate to match lot values of FF lots").) However, the note is ambiguous and offers little insight into its intended purpose. Foster does not point to any evidence in the record illuminating its meaning or explaining its import. Moreover, as the DLGF correctly points out in its brief, the accuracy of the note is not within the DLGF's review authority. (Interv'r Suppl. Br. at 3.) As has been noted, the statute only directs the DLGF to "review the land values determined by the assessor." IND CODE § 6-1.1-4-13.6(e). An inconsistency between the note and the land values does not mean the land values are inaccurate, though it may indicate scrutiny is warranted.

highlighted by Foster as differing property characteristics may yield different unit values to accurately reflect the value of a property. *Id.* at 13–14 (noting that different valuation methods are appropriate for different types of property).

The Court remains unconvinced that differences in land order base rates are inherently demonstrative of a fundamental error in the land order. The base rates are best understood as starting points, from which the value of specific properties may be derived and thereafter reviewed through the assessment appeals process. Foster fails to support her claims about errors in the land order with legal authority, evidence about property classifications or characteristics, or evidence of generally accepted appraisal practice. The Court cannot presume that the difference between two different classifications in a land order should not result in different values due to substantive differences between the properties or their locations. Without an argument supported by evidence in the record to show the alleged error and its effect on the entire land order, the Court will not disturb the DLGF's determination.

### B. Notice of the Public Hearing

Foster, through counsel, argues that she was entitled to notice of the land order review process, and that the lack of notice violated her due process rights. In her briefing, Foster argues that the DLGF violated her right to procedural due process when it failed to provide her with actual notice of the hearing. (*See* Interv'r Br. at 4.) She claims that the owners of every property in the Miller Beach neighborhood are entitled to actual notice of the DLGF's hearing due to the "disproportionate impact" of the land order on these properties. (Id.) The Court disagrees.

"The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.' Only after finding the deprivation of a protected interest do [courts] look to see if the State's procedures comport with due process." *Perdue v. Gargano*, 964 N.E.2d 825, 832 (Ind. 2012) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999)). A protected property interest requires "more than an abstract need or desire for it" or a "unilateral expectation of it." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). Instead, a person must have "a legitimate claim of entitlement." *Id*. These entitlements do not stem from the Constitution, but instead "stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id*.

Although Foster focuses her argument on what sort of notice due process requires, she provides scant details of the protected interest she believes entitles her and other Miller Beach property owners to that notice. In her filings, Foster claims simply that "[the] lack of any procedure for giving notice to [Foster] cannot, as a matter of law, be reasonable," and cites *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950) and *Front Row Motors v. Jones*, 5 N.E.3d 753 (Ind. 2014). (Interv'r Br. at 5; *see also* Interv'r Reply at 7.) While both cases discuss the notice required to meet due process standards, neither provides any analysis of the rights or interests which give rise to a due process violation claim in the first place.

Foster fails to meaningfully engage in any of this analysis of the due process rights at stake in the land order or the DLGF's review of such an order. She provides no discussion about the protected property interest she has in the land order, in the

DLGF's review of that order, or in the DLGF's public hearing.[12] She offers no explanation or identification of her "legitimate claim of entitlement" to this unidentified property interest. And certainly, she does not engage in a meaningful conversation about the source of this claim that secures benefits and supports a finding of her entitlement. Without any discussion of these critical components of a due process claim, the Court is left with little more than an unsupported accusation that is assumed to speak for itself. It does not.

Beyond the question of interests, Foster has not analyzed the adequacy of the process available to her. Foster has not explained how the failure to receive actual notice of the land order or the DLGF's review of that order deprives her of an opportunity to contest the land order when it is actually applied to her property. The property tax assessment and appeal process entitles her to notice of any assessment or reassessment and a right to challenge the application of the land order. IND. CODE § 6-1.1-4-22; *see also* IND. CODE § 6-1.1-15-1.1. Unless and until it is applied to her property, the land order has no direct bearing on her property assessment or her taxes; individual lots often have characteristics that require adjustments to the property's value. *See* GUIDELINES, Ch. 2 at 43 ("Often, there are conditions peculiar to specific lots within a neighborhood that must be analyzed on an individual basis . . . [which] require the assessor to make an adjustment to the value of the lot . . . [called] an influence

---

[12] While Foster does eventually identify a purported interest in her supplemental reply brief (Interv'r Suppl. Reply at 3) (noting a "right to have the land order contain correct calculations so that the rate of taxation is uniform"), she provides only scant analysis of that interest and does not attempt to identify the source of that right. Moreover, such analysis was both untimely and unauthorized by the Court's limited order for supplemental briefing and could have been addressed in Foster's initial brief. The argument is therefore waived. *Davidson*, 211 N.E.3d at 925; *see* Ind. App. R. 46(A).

factor"). It is only through the application of the land order to her land through the assessment that the land order can have any impact on her at all. Yet, Foster does not make any attempt to grapple with the effect of this appeal process, how it affects the analysis of her due process claim, or why it is inadequate to supply the due process she seeks. The answers to these questions are not self-evident.

This Court has firmly established that it will not make a party's argument for it; the party bearing the burden of proof must walk the Court through every element of its analysis. *Ciceu*, 272 N.E.3d at 589 n.4. If a party fails to cite controlling law or provide cogent argument based on that law, the argument may be waived. *Abraytis v. Porter Cnty. Assessor,* 220 N.E.3d 77, 81 (Ind. Tax Ct. 2023). By failing to provide the legal analysis necessary to articulate her due process claim, Foster effectively asks this Court to accept as true her incantation that the lack of notice procedure "cannot . . . be reasonable" and therefore is a violation of due process. (Interv'r Br. at 5.) The Court declines Foster's invitation to develop her argument out of whole cloth. Foster's due process argument is waived.[13]

Regardless of the statutory or constitutional notice requirements for its public hearing on the review of the land order, as detailed above, the DLGF mailed notice to all petition signatories, posted notice on its website, and provided multiple avenues for

---

[13] Even if Foster's argument were not waived, it is unclear whether the land order's creation or its review by the DLGF is subject to the due process standards of adjudicative proceedings. Courts have consistently drawn a distinction between legislative or policymaking actions and adjudicative actions and the due process protections afforded each. *See Onyx Props. LLC v. Bd. of Cnty. Comm'rs of Elbert Cnty.*, 838 F.3d 1039, 1044–45 (10th Cir. 2016) (noting that legislative and policymaking actions are not entitled to traditional procedural due process protections). The prospective nature and general applicability of land orders suggest that they may be best understood as a policy-type rule or standard and therefore not subject to traditional due process requirements, though resolution of that question must be left for another day. *See id.* at 1046–47 (describing factors used to distinguish policymaking and adjudicative actions).

participation. While Foster was not a petition signatory and did not participate in the proceedings before the DLGF, this did not (and does not) hinder her ability to resolve existing issues with her individual land value and any related assessment concerns through administrative appeals. The Court is sympathetic to Foster's position that broader notice would be desirable, but fulfilling such a desire is for the General Assembly, not this Court—and, indeed, the legislature addressed this issue in 2025 by enacting specific notice requirements for future land order hearings. *See* Pub. L. No. 230-2025, § 20, 2025 Ind. Acts 3719 (modifying IND. CODE § 6-1.1-4-13.6).

### C. Notice of Reassessment

Foster claims that the Assessor violated Indiana Code § 6-1.1-4-22 by failing to provide her with notices of reassessment. (Interv'r Br. at 6.) She states that she had no opportunity to argue her case before the DLGF because she was never given notice of reassessment. This argument fundamentally misunderstands the nature of a land order and fails for two reasons.

First, the DLGF's review under Indiana Code § 6-1.1-4-13.6 does not extend to evaluating whether a county assessor properly issued individual assessment notices under Indiana Code § 6-1.1-4-22. As has been stated, the sole power granted to the DLGF by the statute is to "review the land values determined by the county assessor" and "approve", "modify", or "disapprove" those values. *See* IND. CODE § 6-1.1-4-13.6(e). Foster's remedy for any failure to receive an assessment notice lies in the appeal process available under Indiana Code § 6-1.1-15-1.1, not in this proceeding.

Second, section 6-1.1-4-22 does not apply to the adoption of a land order because a land order is not an assessment or a reassessment. Section 6-1.1-4-22 only

requires notice of an assessment, reassessment, or an assessor's appraisal of a property. IND. CODE § 6-1.1-4-22(b). A reassessment, insofar as it relates to a land order, requires adjustments to the base rate to account for a particular parcel of real property. *See* GUIDELINES, Ch. 2 at 43. A land order, standing alone, is nothing more than an official policy, establishing the values of different classifications of land to be used to assess property within a given geographical area. Because section 6-1.1-4-22 is only triggered by an assessment or reassessment and a land order is neither, Foster was not entitled to a notice of reassessment when the 2023 land order was adopted.

### D. Reassessment Frequency

Finally, like Young, Foster argues that her land was improperly assessed "more than once in the four-year cycle" in violation of Indiana Code § 6-1.1-4-4.2(b). (Interv'r Br. at 7–8.) She contends that because the 2022 land order already applied to assessment years 2022 through 2025, a second land order in 2023 was prohibited. However, she does not expand on Young's argument, and therefore her claim fails for the same reasons articulated in Section IA.[14]

**CONCLUSION**

In summary, neither Young nor Foster has demonstrated that the DLGF's final determination approving the 2023 land order was arbitrary, capricious, an abuse of discretion, contrary to law, or unsupported by substantial evidence. While both parties raise concerns about the land order process, their individual assessments, and the

---

[14] Foster also raises a new argument in her supplemental brief regarding the sufficiency of the DLGF's review of the land order and potential errors in data sampling. (Interv'r Suppl. Br. at 6–7.) However, these arguments go beyond the scope of the discussion authorized by the Court in its supplemental briefing order and are thus inappropriate to raise at that time. Foster could have raised those arguments in her original briefing.

adequacy of the DLGF's review, nothing from either party substantiated these concerns with evidence, law, calculations, or other support that would indicate an error requiring remand.

* * *

The DLGF's final determination approving the 2023 Lake County land order values is AFFIRMED.